**Bert OCCULTO and Beverly Occulto, Plaintiffs,**

v.

**ADAMAR OF NEW JERSEY, INC., trading as Tropicana Hotel and Casino, Ramada Inn, Inc., Welton Becket Associates and Becket/Puschal and John Does I, John Does II and John Does III, said names being fictitious, Defendants/Third–Party Plaintiffs,**

v.

**EDWARD R. BACHTLE & ASSOCIATES, INC., Third–Party Defendant.**

Civ. No. 86–2658.

United States District Court, D. New Jersey, Camden Vicinage.

March 17, 1989.

Donald C. Cofsky, Haddonfield, N.J., and Gene E. Goldenziel (Admitted Pro Hac Vice), Needle and Goldenziel, Scranton, Pa., for plaintiffs.

G. Paul Crawshaw, John R. Riordan, Martin, Crawshaw & Mayfield, Westmont, N.J., for defendants/third-party plaintiffs.

Charles W. Heuisler, Archer & Greiner, Haddonfield, N.J., for third-party defendant Edward Bachtle & Assoc., Inc.

JEROME B. SIMANDLE, United States Magistrate:

The defendants in this personal injury case have moved to compel plaintiffs' counsel to disclose two documents which had been furnished by counsel to plaintiffs' medical expert witness. Both documents were prepared by plaintiffs' counsel, Gene E. Goldenziel, Esquire, in connection with this case. The first is a proposed expert's report dated December 20, 1988, which was prepared by plaintiff's attorney and subsequently retyped verbatim and signed by the expert and produced to defense counsel as the plaintiffs' expert's report. The second is the attorney's cover letter to the expert transmitting the proposed December 20 report.

This motion calls upon the court to determine whether a proposed draft expert's report prepared by an attorney and ratified by the expert, summarizing medical facts and expressing medical opinions, together with the transmittal letter to the expert, are protected as attorney work-product under Rule 26(b)(3), Fed.R.Civ.P., and, if so, whether defendants have shown substantial need for these materials and inability to obtain the substantial equivalent by other means. After considering the submissions and oral arguments of counsel, and having reviewed the deposition of plaintiffs' expert where these materials came to light, this court will grant defendants' motion to compel production, for reasons now set forth.

### I. *Factual Background and Procedural History*

Plaintiff, Bert Occulto, has filed this personal injury suit against the defendant, Adamar of New Jersey, arising from a slip and fall accident occurring on defendant's casino hotel premises. One of the areas of dispute concerns the nature, extent and causation of plaintiff's physical injuries. He complained of shoulder problems and was treated for a shoulder separation after the accident in July, 1984. Fifteen months later, in October, 1985, he complained of low back pain and difficulties with his legs.

Plaintiffs filed this case on July 3, 1986. A series of management conferences was convened and the Joint Final Pre–Trial Order was entered April 25, 1988, and the case listed for trial on June 20, 1988 and July 11, 1988 before the Honorable Mitchell H. Cohen. The latter trial date was adjourned because of difficulties in plaintiffs' scheduling of the depositions to preserve trial testimony of plaintiffs' two medical experts, Dr. Leroy Pelicci and Dr. Joseph Demko, whose offices are in the Scranton, Pennsylvania area beyond the subpoena power of this court.

After several false starts, the depositions of Dr. Pelicci and Dr. Demko finally were scheduled for November 15, 1988. Dr. Pelicci's trial deposition was concluded in Scranton on that date, but plaintiffs' counsel cancelled Dr. Demko's trial deposition when counsel discovered that Dr. Demko did not feel prepared to testify on that date due to gaps in his medical file.

Mr. Goldenziel, plaintiffs' counsel, rescheduled Dr. Demko's testimony for January 12, 1989. By cover letter from Mr. Goldenziel to defense counsel dated January 5, 1989, plaintiffs' counsel served a new expert's report, signed by Dr. Demko, dat-

ed December 20, 1988. The preparation of this December 20 report ["Demko Report"] is the subject of the present motion.

In addition to reciting certain medical findings from the records of Occulto's treatment, Dr. Demko's Report expresses opinions as to the cause of Occulto's injuries and his prognosis, including the opinion that the problems in the lumbar discs were caused by the 1984 accident.

The videotaped deposition of Dr. Demko went forward on January 12, 1989, and Mr. Goldenziel concluded the direct examination and Mr. Riordan, on behalf of defendant, had almost completed cross-examination when something quite remarkable occurred. Mr. Riordan discovered that Dr. Demko did not write his own Report. Instead, Dr. Demko's file contained a draft letter, not on Demko's letterhead, also dated December 20, 1988 [hereinafter "Draft Report"] which was verbatim the same as the Demko Report with one important exception. The Draft Report bore the typewritten legend across the top:

PLEASE HAVE RE-TYPED ON YOUR OWN STATIONERY.
THANK YOU.

Dep. Tr. 45, lines 1–4. The draft report was marked Ex. D–1 at the deposition and the witness was questioned about it.

Dr. Demko testified that he did not know who typed the Draft Report (Dep. Tr. 44, lines 23–25) and that he did not even know who wrote it (Dep. Tr. 59, lines 13–20). Dr. Demko testified that he discussed the case with Mr. Goldenziel and he gave his file to Mr. Goldenziel on the date of the aborted deposition on November 15, 1988 at Mr. Goldenziel's request, because Goldenziel said he would like to copy the medical reports in Dr. Demko's file. [Dep. Tr. 45, lines 12–23.] The resulting synopsis was not prepared by Dr. Demko or his office, nor was it dictated by him; it was just retyped by his staff and signed [Dep. Tr. 46, line 21 to 47, line 23.]

Just before Dr. Demko gave this testimony, Mr. Goldenziel stated an objection (actually, he interrupted his own witness's answer) on the record and specifically denied ever seeing the Draft Report before.

This entire colloquy must be set forth, beginning with the cross examination questioning of Mr. Riordan [Tr. 45, line 1 to 46, line 19]:

Q. What does it say at the top of that report that's in the—

A. "Please have retyped on your own stationery. Thank you."

Q. Do you know who put that language on the report?

A. No, I don't.

Q. Could that have been from Mr. Goldenziel?

A. Could have been, its from his office.

Q. And do you know how you prepared that report? Was it—

A. We discussed the salient—at the time of the first deposition, whoever was the lawyer for your firm wanted to copy the chart, and they copied the chart. When they were leaving Mr. Goldenziel says I would like to copy the chart also, and the copier was on the fritz and wasn't copying too well. So, he said do you mind if I take the chart. And so I said, no, I don't mind if you take the chart, but make sure you bring it back.

Q. That was Mr. Goldenziel?

A. Right. So he brought it to his office and he synopisized the records and sent this to me for my pursual to see if this agreed with what—with how I had discussed the case with him and with your partner.

MR. GOLDENZIEL: At this time I'm going to object and move to strike unless the Doctor knows that I typed that because or I did anything of the kind because *I've never seen that document before.* [Emphasis added.]

MR. RIORDAN: Well, I object to your interjection here. I'll finish my questioning and then you can do what you like with it, but I think at this point this is my cross examination, and I ask to be allowed to finish it and you obviously will have a chance to redirect.

MR. GOLDENZIEL: Surely.

BY MR. RIORDAN:

Q. So, Doctor, that the language of that letter was prepared by someone other

than you and sent to you for review and approval?

A. This is my synopsis of the case.

Thus, Mr. Goldenziel explicitly denied knowledge of the Draft Report, saying "I've never seen that document before." This denial was false, and Mr. Goldenziel's subsequent lines of questioning were likewise calculated to create the false impression that he did not prepare the report, such as his re-direct examination [Tr. at 59, lines 13–20]:

Q. [by Mr. Goldenziel]. And, Doctor, to your personal knowledge did my office write the letter, you know, which you referred to which counsel marked in evidence?

A. To my personal knowledge?

Q. Yes.

A. No. I mean, I don't know. To my personal knowledge, no.

His denial of knowledge and his own questioning confused even his own expert witness.

Mr. Goldenziel's statement above was false because he later admitted, on January 30, 1989, during the oral argument upon this motion, that he wrote Dr. Demko's report. He prepared the Draft Report from Dr. Demko's file after allegedly discussing these matters on November 15. He forwarded the Draft Report to Dr. Demko on or about December 20, and at first Dr. Demko erroneously signed the Draft Report [Ex. D–1] without retyping. Then, Mr. Goldenziel or his office again indicated to Dr. Demko that he should re-type the report on his own stationery, according to Mr. Goldenziel's admissions at oral argument. Mr. Goldenziel argued that he saw nothing wrong with this procedure.

Mr. Goldenziel's argument to this court that his writing of a medical expert's report was an innocent practice, and in fact his "normal procedure," is also questionable. Mr. Goldenziel prepared a second document on December 20, 1988, namely, his three-sentence cover letter to Dr. Demko [marked "P–1" at the hearing on January 30, 1989] which Mr. Goldenziel submitted for *in camera* review. The court had directed Mr. Goldenziel, at the conclusion of the hearing, to furnish for *in camera* inspection copies of all documents he exchanged with Dr. Demko. This cover letter [P–1] and the Draft Report [D–1] were the only documents he produced. The cover letter contains a statement which, to be charitable, is inconsistent with Mr. Goldenziel's professed innocence.

The discoverability of the Draft Report and cover letter are next discussed.

## II. *Discussion of Law*

A party expecting to use expert testimony in the District of New Jersey is required to serve an expert's report, accompanied by a curriculum vitae of the proposed expert, within the deadline set by the Scheduling Order, pursuant to General Rule 15A.5. The expert's report contains a narrative of the information required by Rule 26(b)(4)(A)(i), Fed.R.Civ.P., namely, the subject matter on which the expert is expected to testify, the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion. The Scheduling Order also permits depositions of experts to go forward as supplemental expert discovery under Rule 26(b)(4)(A)(ii).

In the present case, the December 20, 1988 letter was such a report, and it was signed by Dr. Demko and served by Mr. Goldenziel, albeit woefully out of time under the prior Scheduling Orders and amendments thereto (a subject not addressed here).

At issue here, under these unusual circumstances, is whether Mr. Goldenziel's draft of the report which was later endorsed by Dr. Demko, and its accompanying cover letter, is discoverable as expert material or is protected from disclosure by the attorney work-product provision of Rule 26(b)(3), as Mr. Goldenziel claims.

As documents prepared by Mr. Goldenziel for purposes of litigation, Exhibits D–1 and P–1 would seem to fit into the category of attorney work product. The protection of work product recognizes "the general policy against invading the privacy of an attorney's course of preparation," *Hickman v. Taylor*, 329 U.S. 495, 512, 67 S.Ct.

385, 394, 91 L.Ed. 451 (1947). The purpose of upholding the work product protection is to promote justice by encouraging a lawyer to perform his or her duties in case preparation "without undue and needless interference." *Id.* at 511–12, 67 S.Ct. at 393–94.

The work product protection, of course, is not absolute. Work product may be discovered under Rule 26(b)(3)

> only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means.

Special care is to be taken to protect against disclosure of the "mental impressions, conclusions, opinions, or legal theories" of the attorney, Rule 26(b)(3), which form the "core" of the work product doctrine. *Sporck v. Peil,* 759 F.2d 312, 316 (3d Cir.), *cert. denied,* 474 U.S. 903, 106 S.Ct. 232, 88 L.Ed.2d 230 (1985). Thus, the Supreme Court has emphasized the "special protection to work product revealing the attorney's mental process." *Upjohn Co. v. United States,* 449 U.S. 383, 400, 101 S.Ct. 677, 688, 66 L.Ed.2d 584 (1981).

There is no doubt, however, that a party is entitled to discover the facts relied upon by the expert witness, as provided in Rule 26(b)(4)(A)(i) and in the expert report requirement. Meaningful discovery of an expert's opinions is necessary to foster effective cross-examination, Advisory Committee Notes, Rule 26(b)(3) (1970), and an expert's prior opinions on the same subject matter are clearly discoverable.

We must also consider the teachings of the Third Circuit in *Bogosian v. Gulf Oil Corp.,* 738 F.2d 587 (3d Cir.1984). In *Bogosian,* the district court held that memoranda prepared by the party's attorney and reviewed by the party's expert witness were discoverable as expert materials under Rule 26(b)(4), and not protected from discovery as attorney work-product under Rule 26(b)(3). The memoranda consisted "solely" of the mental impressions, thought processes, opinions and legal theories of

counsel, that is, the core work product, *id.* at 588. The opinion is silent regarding whether the expert witnesses actually relied upon any of the memoranda; it is clear that they could not have relied upon any facts contained therein because the memoranda were exclusively core work product, which does not embrace statements of fact. It is similarly unclear that the district court performed the tests required in applying Rule 26(b)(3) to determine whether the party seeking discovery had shown substantial need and inability to obtain the substantial equivalent without undue hardship; it would appear, instead, that no such test was performed, as the district court held that these memoranda were within the "grounds for each opinion" under Rule 26(b)(4) and therefore discoverable notwithstanding their status as attorney work product, *id.* at 590–91.

The Third Circuit remanded the case for further proceedings consistent with the majority's view that the district court had erred. The Third Circuit held that the district court erred in compelling production of the work product without considering the substantial need test and also considering whether a redaction of the document would provide equivalent factual discovery while protecting the "legal theories and the attorney-expert dialectic," *id.* at 595. The *Bogosian* majority noted that the question of an examination into the lawyer's role is "an issue not before us." *Id.* Of course, this very issue of Mr. Goldenziel's drafting of the expert's report and concealment is before this court now.

One searches in vain for precedent discussing the situation where an attorney has completely drafted the expert's opinion letter, to which the expert then signed his name, and denied doing so upon the record of the expert's testimony. Notwithstanding Mr. Goldenziel's allegations that this is his normal practice, I have not become aware of another case in which the attorney has done so in a verbatim self-addressed expert report.

A party receiving an adversary's expert's signed report has a right to rely upon the document for what it purports to be—the

expert's considered analysis of facts and statement of opinions applying the expert's special education, training and experience. Experts participate in a case because, ultimately, the trier of fact will be assisted by their opinions, pursuant to Rule 702, Fed. R.Ev. They do not participate as the alter-ego of the attorney who will be trying the case.

The weight accorded to an expert's opinion must vary in accordance with the expert's competence and knowledge; an expert who can be shown to have adopted the attorney's opinion as his own stands less tall before the jury than an expert who has engaged in painstaking inquiry and analysis before arriving at an opinion.

The balancing test called for in *Bogosian* would require, at a minimum, a recognition of the degree to which the expert's opinion derives from and relies upon work product which is not his or her own, as one consideration. Whether the attorney's memorandum is factual and chronological on the one hand, or laced with the attorney's intimate observations and opinions about the case on the other, must also be considered. Finally, as *Bogosian* teaches, the importance of avoiding undue interference into the lawyer's preparation must be upheld.

I have considered the document *in camera*, and obtained the argument of Mr. Goldenziel on the record *ex parte* concerning his decision to prepare Dr. Demko's report. His argument does not reflect anything other than a confirmation of his own poor judgment in handling this expert's report and deposition, in my view. I find that defendant has demonstrated a substantial need to obtain this discovery, which cannot be obtained in its substantial equivalent by other means, pursuant to Rule 26(b)(3).

First, Ex. D-1 is basically factual, lifting selected excerpts from medical records. This is not a document in which the attorney suggests strategies or tactics to the expert witness. It is instead a selective chronology of facts from various records.[1]

Factual material assembled by an attorney for consideration of an expert is not entitled to the same high degree of protection as is afforded to core work product. *Bogosian, supra,* at 595–596.

Second, the opinions expressed in Ex. D-1 by Mr. Goldenziel are not legal opinions. They are medical opinions, such as causation of plaintiff's lower back injury. The key medical opinions in the Demko Report are stated therein as follows:

> It is my opinion that Bert Occulto will suffer discomfort on a chronic basis with arthritis in the area of his left shoulder, as well as in the area of the above–described two discs in his lumber [sic] spine. These three problems were caused by the fall on July 7, 1985 [sic: should read 1984].

This medical opinion that the fall caused the lumbar spine problem is not derived from any other source, as no annotation is given. This is an area of high controversy in this case because, in defendants' view, the first complaint of low back problems does not emerge for 15 months post-accident, rendering causation of his significant injury questionable. It does not serve the truth-finding process to preclude meaningful inquiry into the expert's derivation of this opinion.

Third, this same result would not obtain for tactics or advice contained in a letter from counsel to the expert. An attorney's observations or exhortations to the expert, such as, "Be aware of the contrary opinions expressed by Dr. Smith and Dr. Jones," or "It's important to stress the significant factors in our favor, such as X, Y and Z," are protected as core work product, that is, the attorney's tactical decisions and strategies in preparing the case. The present document, Ex. D-1, contains none of this. It is instead cast as the expert's opinion, in the expert's own voice, reciting the factors important to the expert, subject only to the expert's signature. These opinions are highly relevant to the case because they became, *verbatim*, the expert's opin-

---

1. This is shown by Mr. Goldenziel's supplemental submission dated January 30, 1989, which annotates the Demko Report with eleven references to places in other records where some of the information appears, attaching those records for reference.

ions, and not because the attorney voiced the opinions or tactics.

Fourth, as a practical matter, disclosure of Ex. D–1 does not intrude any further into work product, because Ex. D–1 has already been disclosed in Dr. Demko's testimony, including Mr. Goldenziel's annotation thereon, "PLEASE HAVE RE–TYPED ON YOUR OWN STATIONERY," Dep. Tr. 45, lines 1–4. It was disclosed and testified to by Dr. Demko. Although the factors previously discussed are controlling and compel discovery here, even if they did not, this document would be discoverable under the doctrine of waiver by disclosure.

Thus, the court holds that Ex. D–1 is discoverable in this case.

Finally, we turn to Ex. P–1, Mr. Goldenziel's December 20, 1988 cover letter to Dr. Demko. This letter falls directly into the same subject matter as Mr. Goldenziel's instruction to his expert on Ex. D–1, above, to retype the report on the expert's own stationery. Ex. P–1 has not previously been disclosed to defense counsel, but the defendants' showing supporting disclosure is just as compelling as with respect to Ex. D–1, above.

We are concerned not just with the discoverability of a few documents but with the integrity of the truth-finding process. The work-product protection, as noted above, shields disclosure of the attorney's preparations because higher values are to be served in protecting the thought processes of counsel. But what "higher value" can possibly be served by suppressing the Goldenziel cover letter which contains, in my view, such dramatic confirmation of attorney misconduct undermining the integrity of this process?

In this case, Mr. Goldenziel,[2] an attorney at law, admitted to practice before this court in this case *pro hac vice*, has made a false exculpatory statement concerning his conduct upon the record of a trial testimo-

ny deposition, stating that "I've never seen that document before," and interfering with the orderly cross-examination of his own expert witness, and conducting the misleading re-direct examination described above. In fact, these documents demonstrate the opposite. This conduct cannot be tolerated; whether disciplinary action is warranted is not considered in this discovery motion.

The defendants have amply demonstrated, in my view, their entitlement to obtain disclosure of the Ex. P–1 cover letter. It is highly relevant to the expert's opinion testimony in this case as well as the integrity of the plaintiffs' attorney and expert witness, and the substantial equivalent can be obtained from no other source.

Defendants' motion is granted in its entirety.

---

2. Plaintiffs' local counsel, Donald C. Cofsky, Esquire, did not participate in the Demko report or deposition, nor in the argument of this motion. Mr. Cofsky has the obligation as New Jersey counsel, pursuant to General Rule 4 C, to supervise the conduct of his specially-admitted Pennsylvania counterpart, Mr. Goldenziel, as well as to appear in court unless excused. These duties were reinforced in the Order admitting Mr. Goldenziel *pro hac vice*, filed April 21, 1987. It appears that Mr. Cofsky has not taken the active role contemplated by General Rule 4 C, and he will be strictly required to do so in this case in the future.