See also 775 F.Supp. 1258, 775 F.Supp. 1269.

**INTERMEDICS, INC., a Texas corporation, Plaintiff,**

**v.**

**VENTRITEX, INC., a California corporation; Michael Sweeney, an individual; and Benjamin Pless, an individual, Defendants.**

**No. C 90 20233 JW (WDB).**

United States District Court, N.D. California.

Oct. 28, 1991.

## ORDER AND OPINION RE DEFENDANTS' MOTION TO COMPEL AND PLAINTIFF'S MOTION FOR RECONSIDERATION

WAYNE D. BRAZIL, United States Magistrate Judge.

On May 14, 1991, the court ordered plaintiff's expert witness, Dr. Bruch, to respond to deposition questions and produce documents regarding communications between plaintiff's counsel and Dr. Bruch which relate to subjects about which Dr. Bruch is expected to testify. Subsequently, plaintiff filed a motion for reconsideration, urging the court to reverse its order of May 14. In response to plaintiff's motion for reconsideration, the court stayed the disputed discovery from Dr. Bruch pending disposition of the motion for reconsideration. In the interim, the court reached the merits of and ruled in defendants' favor on their defense under 35 U.S.C. § 271(e)(1). While that ruling has rendered moot the controversy as to Dr. Bruch's understanding of § 271(e)(1), and evidence as to how he acquired that understanding, the parties have asked the court to rule on the motion anyway because they expect the generic issue raised by it to resurface repeatedly in this case. Thus we announce here "law of the case" that will govern discovery of communications from counsel to experts who will offer testimony in conjunction with motions or trial.

## I. INTRODUCTION

In this case plaintiff alleges patent infringement and misappropriation of trade secrets in connection with the parties' development of a sophisticated medical device known as an implantable defibrillator. Until recently there were pending cross motions for summary judgment that addressed whether defendants were entitled to invoke the exemption from patent infringement claims that attaches to clinical trials under 35 U.S.C. § 271(e)(1). In its opposition to defendants' motion for summary judgment on this issue, plaintiff submitted a declaration from Dr. Bruch which supported plaintiff's contention that defendants could not avail themselves of the § 271(e)(1) defense.

In order to prepare their submissions to the court, and pursuant to our order of March 28, 1991, defendants noticed the deposition of Dr. Bruch. At the deposition defendants asked Dr. Bruch questions about what counsel for Intermedics had told him about the § 271(e)(1) exemption, presumably in an attempt to determine whether those communications affected Dr. Bruch's expert opinion. Defendants also requested copies of documents prepared by plaintiff's counsel which were shown to Dr. Bruch and which may have contributed to the formation of the opinions expressed in his declaration. Plaintiff's counsel instructed Dr. Bruch not to respond to those questions and refused to produce the documents requested. Defendants then filed the motion to compel which forced us to confront the issues we address in this opinion.

Defendants' motion raises a fundamental and important question: are communications (written or oral) from counsel to an expert who has been retained to offer testimony, and which relate to the subjects about which the expert will testify, discoverable? Plaintiff contends that the communications that defendants seek to discover constitute core opinion work product that is protected from disclosure under virtually all circumstances, and certainly under the circumstances of this case, by Federal Rule of Civil Procedure 26(b)(3). Defendants contend that, under Federal Rule of Civil Procedure 26(b)(4)(A) and under doctrine developed in explication of Federal Rules of Evidence 702, 703, and

705,[1] they are entitled to know all the communications and information that reached Dr. Bruch in the process by which he formed the opinions about which he will testify. Defendants further contend that they are entitled to explore, in cross-examination, the extent to which Dr. Bruch's expert testimony may have been influenced (or even dictated) by communications from plaintiff's counsel.

Because neither the United States Court of Appeals for the Ninth Circuit, nor the Supreme Court, has purported to resolve the issue presented here, and because the courts from other jurisdictions that have considered these matters have agreed

1. We note that it is arguable that doctrine developed under Federal Rule of Evidence 612 also might be relevant, at least in some circumstances, to the issues addressed in this opinion. That Rule provides that adverse parties are entitled to inspect and cross examine a witness with respect to documents the witness has used to refresh memory for the purpose of testifying. While the legislative history clearly indicates that at least the sponsors in the House of Representatives intended "that nothing in the Rule be construed as barring the assertion of a privilege with respect to writings used by a witness to refresh his memory," some courts have construed this Rule as affording a basis for compelling disclosure of communications that otherwise would be at least presumptively protected by privilege or the work product doctrine. *See, e.g., Wheeling–Pittsburgh Steel Corp. v. Underwriters Laboratories, Inc.,* 81 F.R.D. 8 (N.D.Ill. 1978); *Marshall v. United States Postal Service,* 88 F.R.D. 348 (D.D.C.1980); *Derderian v. Polaroid Corp.,* 121 F.R.D. 13 (D.Mass.1988) (disclosure of documents reviewed by a witness prior to testifying may be ordered when "necessary in the interests of justice"); *Prucha v. M & N Modern Hydraulic Press Co.,* 76 F.R.D. 207 (W.D.Wis.1977). There are some cases in which courts have indicated that, depending on the circumstances, it may be appropriate to order disclosure of non-opinion work product while protecting at least some forms of opinion work product. *See Peil v. National Semiconductor Corp.,* 105 F.R.D. 463, 466–67 (E.D.Pa.1984); *James Julian, Inc. v. Raytheon Co.,* 93 F.R.D. 138, 146 (D.Del.1982).

While it appears that no court has squarely held that Rule 612 affords a sufficient basis for compelling the disclosure of core opinion work product, at least one judge has intimated that he might well be prepared to so hold. Judge Marvin Frankel, writing in *Berkey Photo, Inc. v. Eastman Kodak Company,* 74 F.R.D. 613 (S.D.N.Y.1977), one of the most frequently cited opinions dealing with these matters, noted that "it is disquieting to posit that a party's lawyer may 'aid' a witness with items of work product and then prevent totally the access that might reveal and counteract the effects of such assistance. There is much to be said for a view that a party or its lawyer, meaning to invoke the privilege, ought to use other and different materials, available later to a cross-examiner, in the preparation of witnesses." *Id.* at 616. While Judge Frankel eventually concluded that in the case before him a showing sufficient to justify penetration of work product protection had not been made, he opined that "[t]here would appear ... to be room for allowing discovery, either on a theory of waiver or of qualified privilege, where an attempt is made to exceed decent limits of preparation on the one hand and concealment on the other." *Id.* at 617.

Obviously troubled by the potential unfairness of not permitting discovery of communications to witnesses that could affect the content of testimony, Judge Frankel added a postscript to his opinion to announce a warning to counsel about how he would approach this issue in the future (one source of his reluctance to grant the motion to compel that gave rise to the particular dispute he was addressing in this opinion was concern that counsel might not have foreseen that sharing the documents with the testifying witness would jeopardize the work product protection): "this court notes now, with hindsight, that there is not a compelling rationale for the view that counsel may (1) deliver work product to an expert or other witness to be 'useful to the client,' but then (2) withhold the material from an adversary who seeks to exploit the fact of this assistance in cross-examining the witness. From now on, as the problem and the pertinent legal materials become more familiar, there should be a sharp discounting of the concerns on which defendant is prevailing today. To put the point succinctly, there will be hereafter powerful reason to hold that materials considered work product should be withheld from prospective witnesses if they are to be withheld from opposing parties." *Id.; also cf., Al–Rowaishan Establishment v. Beatrice Co.,* 92 F.R.D. 779 (S.D.N.Y.1982).

While we are quite sympathetic with the spirit in which Judge Frankel approached these questions, we choose not to base our disposition of defendant's motion on doctrine emanating from Federal Rule of Evidence 612, in part because we are not satisfied that any court has explained sufficiently how, *in light of its legislative history* (at least in the House of Representatives), this Rule could be used to compel disclosure of communications that otherwise would be privileged or protected as work product. We do not mean by this to suggest that the courts that have used Rule 612 as a basis for compelling disclosure of such communications clearly are in error. We simply have not researched the legislative history sufficiently, or explored enough all the other facets of this matter, to form a judgment in which we have the requisite confidence.

about neither the kind of analysis that should be used nor the results that should be reached,[2] we feel constrained to examine the issues afresh.

A divided panel of the United States Court of Appeals for the Third Circuit rendered the single most important opinion on the issues raised here in *Bogosian v. Gulf Oil Corp.*, 738 F.2d 587 (3rd Cir.1984). The *Bogosian* majority discussed the relationship between paragraphs (3) and (4) of Federal Rule of Civil Procedure 26(b) and concluded that on the facts there presented, it was error to compel the disclosure of opinion work product even when it had been disclosed to a testifying expert. While we do so with trepidation, and in full recognition that this is an area in which there is considerable room within which thoughtful judges can reach different conclusions, we respectfully disagree with the analysis and holding of the *Bogosian* majority.[3]

For reasons set forth at length below, we hold that, absent an extraordinary showing of unfairness that goes well beyond the interests generally protected by the work product doctrine, written and oral communications from a lawyer to an expert that

are related to matters about which the expert will offer testimony are discoverable, even when those communications otherwise would be deemed opinion work product.

## II. DETERMINING WHAT KIND OF ANALYSIS OR TEST IS APPROPRIATE

■ The first question we address is whether the kinds of communications in issue here receive any protection at all under Federal Rule of Civil Procedure 26(b)(3). Are these kinds of communications "work product" within the meaning of that Rule? While we choose not to rest our resolution of defendants' motion to compel on this ground, we feel constrained to note that this is by no means a self-answering or silly question. And while the *Bogosian* court concluded that communications from a lawyer to an expert witness that are related to the subjects about which the expert would testify are within the ambit of protections afforded by Rule 26(b)(3), we think the question warrants some additional consideration.

---

**2.** See cases cited in footnote 3, *infra*.

**3.** A number of courts have followed the *Bogosian* majority. *See e.g., Hydramar Inc. v. General Dynamics Corp.,* 119 F.R.D. 367 (E.D.Pa. 1988); *Hamel v. General Motors Corp.,* 128 F.R.D. 281 (D.Kan.1989); *North Carolina Electric Membership Corp. v. Carolina Power & Light Co.,* 108 F.R.D. 283 (M.D.N.C.1985); *United States v. 215.7 Acres of Land,* 719 F.Supp. 273 (D.Del.1989).

Other courts, however, have decided the matter differently. In *Boring v. Keller,* 97 F.R.D. 404 (D.C.Colo.1983), Judge Kane held that "one situation in which opinion work product is not protected is where an expert witness utilizes counsel's opinion work product in order to formulate his or her opinion." *Id.* at 407. Judge Kane weighed many of the same factors that the *Bogosian* court considered a year later, but concluded that the purpose of Rule 26(b)(4) would be frustrated if information so central to the credibility of an expert witness was held to be outside of the scope of discovery. *Id.* at 407–408. The court stressed that the discovery plaintiff sought could have a critical effect on the credibility of the expert witness. "If plaintiff is prevented from examining the documents", the court argued, "plaintiff will not have the opportunity to impeach the expert wit-

ness at cross-examination. The documents will remain undiscoverable, and this will frustrate the purpose of F.R.Civ.P. 26(b)(4)." *Id.* at 408. Therefore, given the importance of a full and fair cross-examination of the expert witness and because "immunized materials should not remain undiscoverable after they have been used to influence and shape testimony," the court held that discovery should proceed despite its intrusion on opinion work product. *Id.* at 407.

Similarly, in *William Penn Life Assurance Company of America v. Brown Transfer and Storage Co.,* 1990 WL 343573, 1990 U.S.Dist.Lexis 1716 (W.Dist.Mo.1990), the court, persuaded by the reasoning expressed in the *Boring* opinion and the dissent in *Bogosian,* held that the interest in permitting full cross-examination into the basis of an expert witnesses' opinion outweighs the need to protect the attorney's opinion work product. *See also, Occulto v. Adamar of New Jersey, Inc.,* 125 F.R.D. 611 (D.N.J. 1989) (draft of a doctor's report, prepared by plaintiff's attorney and endorsed by the doctor, was not protected from discovery as attorney work product); and *cf. Heitmann v. Concrete Pipe Machinery,* 98 F.R.D. 740 (E.D.Mo.1983) (even if report of nontestifying expert was prepared in anticipation of litigation, it was subject to discovery by plaintiff where the report was needed for effective cross-examination of a testi-

In *Bogosian*, the court rejected the district judge's view that the first clause of Rule 26(b)(3) indicates that both of the sentences that make up the first paragraph of that rule are qualified and limited by the provisions of Rule 26(b)(4).[4] The first clause of 26(b)(3) reads: "Subject to the provisions of subdivision (b)(4) of this rule,...." *Bogosian* held that this "proviso" does not apply to the second sentence of the first paragraph of 26(b)(3), the sentence that covers "opinion" work product (as distinguished from non-opinion work product). In reaching this conclusion, the *Bogosian* court relied on a "parsing of Rule 26(b)(3)". In that parsing, the *Bogosian* opinion did not say clearly why it concluded that the proviso applied only to the first sentence in this paragraph. *Bogosian* suggested that the purpose of the proviso was to signify that "trial preparation material prepared by an expert is also subject to discovery, but only under the special requirements pertaining to expert discovery set forth in Rule 26(b)(4)." *Id.* at 594.

There are a couple of problems with this analysis. First, the Advisory Committee's Notes make it clear that a purpose of creating a separate subsection of the Rule and devoting it specifically to discovery from experts was to "reject as ill-considered the decisions which have sought to bring expert information within the work product doctrine." Advisory Committee's Notes regarding 1970 amendments to Rule 26. Thus, the drafters of these rules wanted to make sure that courts recognized that analysis of discovery of work product and analysis of discovery of information from expert witnesses were two conceptually quite distinct enterprises and that it was error to treat as "work product" the opinions of experts, as well as the grounds for such opinions, the discovery of both of which is expressly governed by subparagraph (4) of Rule 26(b). We fail to see how this explanation of the relationship between parts (b)(3) and (b)(4) of the Rule supports an inference that the proviso in the first sentence of (b)(3) does not apply to the second sentence of that portion of the Rule.

Indeed, we believe that the language of that second sentence supports the opposite inference. That language begins: "In ordering discovery of *such materials* when the required showing has been made...." (emphasis added). The phrase "such materials" clearly relates back to and incorporates by reference the concepts at the center of the immediately preceding sentence, the sentence that begins with the proviso. The "materials" referred to here are "documents ... prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative...." It seems clear that the drafters anticipated that, at least in some instances,

fying expert who relied upon the report in reaching his opinion).

**4.** The relevant portions of Rule 26(b) read as follows:

(3) Trial Preparation: Materials. Subject to the provisions of subdivision (b)(4) of this rule, a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

(4) Trial Preparation: Experts. Discovery of facts known and opinions held by experts, otherwise discoverable under the provisions of subdivision (b)(1) of this rule and acquired or developed in anticipation of litigation or for trial, may be obtained only as follows:

(A)(i) A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion. (ii) Upon motion, the court may order further discovery by other means, subject to such restrictions as to scope and such provisions pursuant to subdivision (b)(4)(C) of this rule, concerning fees and expenses as the court may deem appropriate.

opinion work product would be found within documents that otherwise would constitute non-opinion work product. The drafters' goal in writing the second sentence of this paragraph was simply to make sure that special protection attached to the opinion work product, not to suggest that the first sentence's proviso was applicable only to non-opinion work product.[5]

The drafters obviously foresaw that expert witnesses retained by parties to testify would generate documents that otherwise would constitute opinion work product; if the proviso from the first sentence did not apply to the second sentence, documents reflecting those opinions would be treated as opinion work product and thus would be immune from discovery in most instances. That analytical approach (and result) is exactly what the drafters were trying to avoid—both by inserting the proviso at the beginning of the paragraph dealing with work product and by structuring the rule so that discovery from experts was the subject of a wholly separate subsection.

Having concluded that the proviso of the first sentence of Rule 26(b)(3) also qualifies and limits the second sentence of that Rule, we must ask whether the proviso and the structuring of the Rule so as to compel separate analytical treatment of work product, on the one hand, and, on the other, opinions of testifying experts and the grounds for those opinions, support an inference either (1) that communications of the kind in issue here are not covered by Rule 26(b)(3) at all or, short of that, (2) even if they are covered, in cases where the policies that inform subparagraph (3) and those that inform subparagraph (4) of the Rule come into conflict, the latter should be given some measure of preference.

We think it probable that the questions we raise here did not occur to the drafters of the 1970 amendments to the Rules. There certainly is no indication in the published Notes that the Advisory Committee addressed these questions. And the questions are of sufficient practical importance that one would expect them to be discussed in the Notes if the Committee had in fact considered them.

Additional support for the inference that the Advisory Committee did not consider these questions comes from an examination of what kinds of information the drafters seemed to contemplate being discoverable from testifying experts, at least as a matter of course, under subparagraph (4) of Rule 26(b). Clearly the Committee contemplated routine disclosure of "the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion." Fed. R.Civ.P. 26(b)(4)(A)(i). The Committee also obviously contemplated that in some cases, at least, district judges would order "further discovery" from such experts, as by deposition. Presumably the purpose of such "further discovery" would be to go beyond the "summary" of the grounds for the expert's views by conducting the kind of probing inquiry into the bases for opinions that would equip the examining attorney to prepare adequately for cross-examination at trial and to present effective rebuttal testimony from her own expert. These are the reasons, according to the Committee's Notes, for writing the new provisions of the rules that expressly opened up discovery from testifying experts. But the fact that the *entitlement* created by the new rule was limited to a summary of the grounds for the expert's views, and that further probing could be conducted only on court order following a motion, suggests that the drafters may have had a more limited vision of the scope of the inquiry that normally would take place into the processes by which experts formed their views than has come to be accepted, at least in some courts, in the

---

5. In explaining this first paragraph of Rule 26(b)(3), the Advisory Committee Notes (1970) make the following observations: "The subdivision then goes on to protect against disclosure the mental impressions, conclusions, opinions, or legal theories concerning the litigation of an attorney or other representative of a party.... In enforcing this provision of the subdivision, the courts will sometimes find it necessary to order disclosure of a document but with portions deleted."

intervening two decades.[6] We must keep in mind the context in which the Committee was working in the late 1960's: many courts had refused to permit *any* discovery of expert's views. While a purpose of the 1970 amendments was to overrule that line of authority, the Committee apparently perceived the new rule as more of a modest step forward than a radical, unchecked venture into a wholly new era. And if the Advisory Committee foresaw a somewhat less searching examination of the matters considered by experts than has become the norm, it is less likely that that Committee would have anticipated the kinds of issues raised by defendants' motion here.

It is possible, of course, that the Committee silently foresaw the issues with which we struggle here but did not acknowledge them because the Committee felt that it was obvious from the apparent absolute protection of opinion work product afforded by the second sentence of the first paragraph of Rule 26(b)(3) that discovery could never be had of opinions communicated in private by lawyers to experts. This seems to us unlikely, however, because it would have been so inconsistent with the central thrust of the underlying rationale for adding the new provisions for discovery from testifying experts. *Fairness* was at the center of that rationale. See the Advisory Committee's Notes accompanying the 1970 amendments to Rule 26. What the Committee sought to promote was a fair opportunity to expose whatever weaknesses, unreliabilities, or biases might infect the opinions of testifying experts called by adverse parties. Pursuit of such fairness would have been thoroughly frustrated if the rule prohibited a party from showing that the opinions an expert was presenting at trial as his own had in fact been spoon fed to him and written for him by the lawyer who retained him.

Our inference that the drafters of the relevant parts of Rule 26(b) did not consider the issues we must address here does not necessarily support a conclusion that the kinds of communications that defendants seek to discover cannot constitute "work product". We think it would be unfair to the interests implicated by plaintiff's position in this matter to resolve the pending motion simply by concluding that, as a matter of rule-based definition (i.e., of interpretation of the dynamics between paragraphs (3) and (4) of Rule 26(b)), communications from counsel to a testifying expert on subjects about which testimony will be offered cannot constitute "work product", i.e., fall completely outside the reach of paragraph (b)(3). The concerns and policies that have informed the federal work product doctrine clearly could be implicated with respect to at least some of the kinds of documents that might be reached through a motion to compel of the kind we face here. For example, a lawyer, working in the privacy of her own office, might, for purposes of improving the quality and clarity of her thinking about the case, write memoranda to her own file that reflected her candid assessments of the evidence in the case and of the probabilities that different, competing views of the relevant law might be endorsed by the court before whom the matter was pending. Such memoranda would represent classic opinion work product if their confidentiality were maintained. As such, they would be discoverable under only a very limited number of circumstances. *See, e.g., Handgards, Inc. v. Johnson & Johnson,* 413 F.Supp. 926 (N.D.Cal.1976). If the lawyer who wrote these memoranda later decided to hire a testifying expert, then shared these memoranda with that expert in order to help him think through the matters about which he would offer his expert opinion at trial, we could not say that the policies that inform the work product doctrine would no

---

**6.** *See, e.g., Eliasen v. Hamilton,* 111 F.R.D. 396, 400, n. 5 (N.D.Ill.1986), where Judge Grady points out that the scope of discovery under Rule 26(b)(4)(A) should not be limited to documents relied on by the expert in support of his opinions, but should extend to documents "considered but rejected by the testifying expert in reaching opinions." Judge Grady went on to point out that "[i]n fact, the documents considered but rejected by the expert trial witness could be even more important for cross-examination than those actually relied upon by him." *Id.*

longer have any applicability to these documents. The discoverability of such documents still could have at least some adverse impact on the system of incentives that is said to underlie our adversarial adjudicatory process and to inspire the work product doctrine. *See Hewlett–Packard Co. v. Bausch & Lomb, Inc.,* 116 F.R.D. 533 (N.D.Cal.1987).

Nor would it seem appropriate (fair) to hold that the act of sharing this material with a retained expert who is expected to testify constitutes a waiver of whatever protections might otherwise attach to the documents under the work product doctrine. Generally (but not always), a finding of waiver requires a showing that a person voluntarily has given up a known right. We could not find that the lawyer in the hypothetical we discussed in the preceding paragraph voluntarily gave up a known right unless, at the time she shared the documents with her expert, the courts already had made it clear that doing so would take the documents out of the reach of the work product doctrine and make them discoverable. As we have pointed out, the courts have developed nothing approaching a clear consensus about what consequences, if any, attach to sharing such documents with a testifying expert. In sum, we believe that work product interests are implicated by the kinds of communications in issue here and that it would be irresponsible to ignore them in ruling on defendants' motion.

We also do not believe, however, that it is appropriate to permit doctrine developed under paragraph (b)(3) of Rule 26 to wholly dominate our analysis. That would be appropriate only if the communications in issue (1) clearly were intended by the rulemakers to receive the full protections of paragraph (b)(3), and (2) did not implicate interests that the rulemakers clearly sought to promote and regulate in a separate subparagraph, here (b)(4). Since it is not clear what status the drafters intended these kinds of communications to have under (b)(3), and since it is clear that these communications directly implicate interests covered by (b)(4), we cannot simply apply doctrine developed under (b)(3). We must not use an analytical approach whose structure presupposes that the rulemakers already have considered and resolved tensions between the various competing interests implicated by defendants' motion. Rather, the structure of our analysis is dictated by our conclusion that the dispute over the communications in issue here exposes an unarticulated and unanticipated tension between paragraphs (3) and (4) of Rule 26(b). Similarly, we perceive an unresolved tension between paragraph (b)(3) of Federal Rule of Civil Procedure 26, on the one hand, and, on the other, interests sought to be advanced and regulated by Federal Rules of Evidence 702, 703, and 705 (as will be discussed, a ruling that the kinds of communications in issue here are not discoverable also could harm some of the interests that underlie the current versions of those rules of evidence).

Given that we are dealing with rules of presumptively comparable standing, we believe that it is appropriate to resolve the tensions between them by adopting an analytical process in which neither side begins with an advantage. Thus, we believe it is appropriate to conduct a truly open balancing analysis [7] in which we: (1) identify the interests that the work product doctrine is intended to promote, (2) make a judgment about how much those interests would be either (a) harmed by a ruling that the kinds of communications in issue here are discoverable or (b) advanced by a ruling that these kinds of communications are not discoverable, (3) identify the relevant interests that are promoted by Federal Rule of Civil Procedure 26(b)(4) and by Federal Rules of Evidence 702, 703, and 705, and then (4) make a judgment about how much

---

**7.** By using the phrase "open balancing analysis" we mean to distinguish the kinds of analyses that are pre-weighted in favor of protecting certain interests, as might be appropriate if the rulemakers had considered all the competing interests and had concluded, as a matter of policy, that it was appropriate to accommodate them by affording some level of preference to one of those interests, or to a set of interests that lined up together against others in the typical situation.

those interests would be either (a) harmed by a ruling that the kinds of communications in issue here are *not* discoverable or (b) advanced by a ruling that these kinds of communications are discoverable.

## III. APPLICATION OF THE OPEN BALANCING TEST

■ The interests that the federal work product doctrine is intended to promote are of considerable importance. As we have discussed at length elsewhere,[8] these interests include, among others, preserving the incentive system that is perceived as essential to our adjudicatory process and creating an environment in which counsel are free to think dispassionately, reliably, and creatively both about the law and the evidence in the case and about which strategic approaches to the litigation are likely to be in their client's best interests. The extremely high level of protection afforded to "opinion" work product through the second sentence of the first paragraph of Rule 26(b)(3) reflects both the rulemakers' and the Supreme Court's views about the importance of the values that can be threatened by efforts to discover the confidential thoughts of litigation counsel. In *Upjohn Co. v. United States*, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981), the Supreme Court emphasized that federal judges should require very strong showings of "necessity and unavailability" before ordering disclosure of confidential documents that constitute opinion work product and that clearly are covered by Rule 26(b)(3). *Id.* at 402, 101 S.Ct. at 689. While the Court in *Upjohn* had no occasion to consider the issues we must resolve here,[9] that opinion reflects clearly the importance that the justices ascribe to the values underlying the work product doctrine, especially as it applies to the private

mental impressions and legal theories of counsel.

While we acknowledge the importance, in the abstract, of the interests that are said to underlie the work product doctrine, it is much less clear that a rule that communications of the kind in issue here are discoverable would necessarily cause serious harm to those interests. In the case at bar, counsel have joined in a request for a ruling on the issues considered here, even though the specific dispute that gave rise initially to defendants' motion is moot, so that they will know how to handle in the future their interactions with the experts they retain to testify. Thus we must ask: how much harm is likely to be caused to work product interests when lawyers know in advance that communications between them and testifying experts will be discoverable if those communications are related to the matters about which the experts will testify?

First, we note that such a rule would not interfere with counsel's capacity to think dispassionately and creatively about his client's case *in private*. Lawyers still would be able to ruminate and strategize freely, and to commit their impressions, opinions, analyses, and strategic options to paper, all in the security of confidentiality, as long as they did not share their thoughts with an expert they would call to testify. This is an important point. It means that lawyers would be able to preserve the privacy of their mental processes and to prevent others from "leeching" off their work. This capacity to preserve their privacy and to prevent others from unfairly reaping benefits from their work should prevent the demoralization of the profession that the Court in *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), appears to have feared. In these significant respects, it appears that the rule that de-

---

**8.** *See Hewlett–Packard Co. v. Bausch & Lomb, Inc.,* 116 F.R.D. 533 (N.D.Cal.1987).

**9.** The materials that were the subject of the Court's analysis in *Upjohn* consisted of notes and memoranda of interviews that the Court felt would tend to reveal the attorney's mental processes. The Court had no difficulty concluding that this is the kind of material that clearly

falls within the protections traditionally afforded by the work product doctrine. Unlike the case at bar, no argument could be made that the material in issue in the relevant part of the *Upjohn* opinion was not covered by paragraph (3) of Rule 26(b) because it was governed by another paragraph or rule, e.g., as here, paragraph (4) of Rule 26(b).

fendants advocate would do little actual harm to the interests that the work product doctrine is intended to promote.

Nor would such a rule stand as a bar to counsel having uninhibited, roaming, educational interchanges with experts, the kinds of exchanges that presumably are necessary in technically complex cases for lawyers to understand the evidence fully and to explore comprehensively the different possible ways to reason about it. The question would not be whether these kinds of conversations could be had, but with which kind of expert. As a practical matter, the rule defendants urge the court to adopt would force counsel in many cases to have these kinds of conversations not with their testifying expert, but with an expert who would *not* be called to testify. This alternative carries a financial cost: parties who wanted their lawyers to be able to have such conversations without fear of disclosure would be constrained to pay two experts when one might otherwise meet their needs.

Of course, a party would retain the option of having her lawyer engage in such dialectical conversations with her testifying expert as long as the party and her counsel were willing to disclose the contents of the conversations. While that is a real option in theory in all cases, for purposes of analyzing the issues presented by defendants' motion we will assume that in many cases parties and counsel will feel constrained not to pursue it, in part out of fear of compromising the positions the party is taking in the litigation and in part out of concern that following this course might force counsel to become a witness.[10] Thus, in our balancing analysis, one factor we must weigh in favor of plaintiff's position is the extra cost that the rule defendants

propose would impose in many cases, the cost of retaining a second, non-testifying expert with whom counsel could have free-wheeling, uninhibited, and fully confidential exchanges.

Plaintiffs might argue that making counsel's communications with a testifying expert discoverable also would impair lawyers' ability to teach experts efficiently what they need to know to prepare to offer useful and well grounded opinions. In response, we point out, first, that under already well established rules opposing parties are entitled to discover all of the factual information, evidence, and scientific or quasi-scientific doctrines, theories or assumptions that an expert takes into account when forming an opinion about which she will testify.[11] Since the "information base" from which an expert works already is discoverable, whether it reaches the expert through communications from counsel or otherwise, we must ask: what are the kinds of things that might be communicated from counsel to a testifying expert that would not be discoverable under the rule that plaintiff advocates? Presumably at least two kinds of things would fall in this category: (1) how counsel organize or package or structure the information they share with the expert and (2) what counsel say about that information, including editorial comments about its relative significance, suggestions about how to interpret the data, or how to package it for presentation by the expert while testifying, or about what inferences should be drawn from it, what meanings should be ascribed to it, or what generalizations it supports.

While these kinds of communications indeed might accelerate an expert's "learning," they might well do so at an extremely high price. What obviously is threatened

---

**10.** Trying to avoid counsel being constrained to become witnesses was one of the purposes of the work product doctrine as originally articulated in *Hickman v. Taylor*, 329 U.S. 495, 512–513, 67 S.Ct. 385, 394, 91 L.Ed. 451 (1947).

The rule we adopt here will not routinely force counsel to become witnesses if they limit what they communicate to testifying experts to data/evidence/factual information. Adversaries will not be permitted to depose counsel

with respect to communications to an expert unless the expert first testifies, in deposition or elsewhere, that she received communications from the lawyers who hired her that relate to the subjects about which she *is to testify* and that went beyond the factual information which the expert considered in forming her opinion (that information already is discoverable).

**11.** *See, e.g., Eliasen v. Hamilton*, 111 F.R.D. 396 (N.D.Ill.1986).

by such communications is the *independence* of the expert's thinking, both her analysis and her conclusions. The risk is that the lawyer will do the thinking for the expert, or, more subtly, that the expert will be influenced, perhaps appreciably, by the way the lawyer presents or discusses the information. These risks would be eliminated if only the data were presented to the expert. The risks would be reduced, arguably considerably, if it were known that all communications from counsel that accompany the transmission of data (and that are relevant to the matters about which the expert will testify) would be reviewable by other experts (retained by opposing parties or appointed by the court) and made known to the trier of fact. That knowledge presumably would make the lawyers appreciably more careful and "objective" in the way they package and comment on the data they share with their experts. It also would induce the experts to be more attentive to possible influences by counsel's communications and to take steps to assure that they can demonstrate the independence of their views. So the trade-offs here seem to be between some increased efficiency in an expert's digestion and analysis of data, on the one hand, and, on the other, reducing the risk of compromising the independence and reliability of the expert's views. Without a showing by plaintiff that the efficiencies involved here are quite considerable (plaintiff has made no such showing), we do not find it difficult to choose between these competing values.

In sum, we are not persuaded that a rule that would permit discovery of communications from counsel to an expert about matters related to the expert's testimony would in fact cause significant harm to the principal interests that the work product doctrine is intended to advance.

We turn at this juncture to an examination of the interests that are intended to be advanced by paragraph (4) of Rule 26(b) of the Federal Rules of Civil Procedure. We will be concerned about how much those interests might be advanced by a rule that would make discoverable the kinds of communications that are in issue here and about how much those interests might be harmed by a rule that in effect would immunize such communications from discovery.

Before turning formally to that inquiry, we note that there is a tight interdependence between the operation of paragraph (4) of Rule 26(b) of the Federal Rules of Civil Procedure and Rules of Evidence 702, 703, and 705. As a panel of Tenth Circuit judges pointed out in *Smith v. Ford Motor Co.*, 626 F.2d 784, 793 (10th Cir.1980), "[t]he combined effect of these new rules [703 and 705 of the Federal Rules of Evidence] is to 'place the full burden of exploration of the facts and assumptions underlying the testimony of an expert witness squarely on the shoulders of opposing counsel's cross-examination. As stated in the Advisory Committee Note to Rule 705, and highlighted by the elimination of the foundation often provided by the hypothetical question, "advance knowledge through pretrial discovery of an expert witness's basis for his opinion is essential for effective cross examination." ' " *Id.*, citations omitted.

As the Advisory Committee's Notes accompanying the 1970 amendments to the Federal Rules of Civil Procedure make clear, it was, fundamentally, concern about fairness that inspired the adoption of paragraph (4) of Rule 26(b). The rulemakers recognized that testimony from experts could be "determinative" in many cases, that such testimony often covered "intricate and difficult issues," that assertive, probing, coherent, and well-informed cross-examination was essential to equipping the trier of fact to judge the persuasive power and reliability of such testimony and to determine which of competing expert views should be credited, and that often that kind of cross-examination would not be possible unless counsel had been permitted to explore thoroughly in pretrial discovery the mental route that the expert had travelled on the way to his or her conclusions.

It is clear that the interests that are intended to be advanced by paragraph (4) of Federal Rule of Civil Procedure 26(b) include nothing less than the integrity and reliability of the truth finding process.

Moreover, this Rule promotes these most fundamental of interests directly, unlike the work product doctrine, which works toward its ends only indirectly, and then only if one accepts as true the empirically debatable assumptions about the sociology of law practice on which it is based.

Having identified the interests that paragraph (4) of the Rule is intended to promote, we next must determine by how much those interests are likely to be advanced by a rule that would make discoverable communications from counsel to experts that relate to the matters about which the experts are to testify. At this crucial juncture we part company again, and most significantly, from the *Bogosian* majority. Over Judge Becker's dissent, the majority in that case asserted that

> [e]xamination and cross-examination of the expert can be *comprehensive and effective* on the relevant issue of the basis for an expert's opinion without an inquiry into the lawyer's role in assisting with the formulation of the theory. Even if examination into the lawyer's role is permissible, an issue not before us, the *marginal* value in the revelation on cross-examination that the expert's view may have originated with an attorney's opinion or theory does not warrant overriding the strong policy against disclosure of documents consisting of core attorney's work product. (Emphasis added)

Along with Judge Becker, we respectfully disagree. We think that there are likely to be many instances in which knowing the *real source* of an expert's views would add significantly to the trier of fact's ability to assess their reliability and persuasive power. When experts testify, they present opinions and reasoning as their own. Knowing that some or all of the reasoning and opinion that is being presented by an expert is not her own, but is a lawyer's, might well have an appreciable effect on the probative value the trier of fact ascribes to the expert testimony. This is true in part because it is both impossible and inappropriate to divorce the substance of the *opinions* offered by an *expert* from

the background, training, special education and experience that the expert brings to the witness stand.

Before a person can be permitted to offer testimony as an expert, the trial court must review and pass judgment on that person's background—for the purpose of determining, among other things, whether that specific background has provided the person with the kind of expertise that is necessary to support the giving of the proffered testimony. Then, on direct examination, counsel sponsoring the expert often thoroughly reviews that background *for the purpose of trying to persuade the jury to accept the expert's views.* Opposing counsel also may focus on specific aspects of the background and training of the witness in an effort to persuade the jury to pay less heed to the expert's testimony. And much might be made of the witness' connections (or lack thereof) with certain kinds of litigants or institutions, or of how often in the past, and at whose behest, the witness has testified on similar matters.

Then, when the expert testifies, she does so as a human being, not just as a book, with the result that when the trier of fact passes judgment on the overall persuasive power of her testimony, it (the jury or the court) takes into account, sometimes to a considerable degree, perceived personal attributes of the witness, including her demeanor, personal style, appearance, manner of speaking, etc. In short, when an expert testifies she says, in effect, believe me not only because of the reasoning I show you, but *because of who I am and of what I have studied, written, and done in the past.* So, with respect to *expert* witnesses in particular, there is, inevitably, a dense and probatively significant interdependence between, on the one hand, the opinions and reasoning they present in testimony and, on the other, their background, experience, and personal characteristics and attributes.

Given that interdependence, it would be fundamentally misleading, and could do great damage to the integrity of the truth finding process, if testimony that was being presented as the independent thinking

of an "expert" in fact was the product, in whole or significant part, of the suggestions of counsel. The trier of fact has a right to know *who* is testifying. If it is the lawyer who really is testifying, surreptitiously through the expert (i.e., if the expert is in any significant measure parroting views that are really the lawyer's), it would be fundamentally unfair to the truth finding process to lead the jury or court to believe that the background and personal attributes of the expert should be taken into account when the persuasive power of the testimony is assessed.

Something of the spirit in which we view this matter is reflected in *Occulto v. Adamar of New Jersey, Inc.*, 125 F.R.D. 611 (D.N.J.1989), where Magistrate Judge Simandle observed that

A party receiving an adversary's expert's report has a right to rely upon the document for what it purports to be—the expert's considered analysis of facts and statement of opinions applying the expert's special education, training and experience. Experts participate in a case because, ultimately, the trier of fact will be assisted by their opinions, pursuant to Rule 702, Fed.R.Ev. They do not participate as the alter ego of the attorney who will be trying the case.

The weight accorded to an expert's opinion must vary in accordance with the expert's competence and knowledge; an expert who can be shown to have adopted the attorney's opinion as his own stands less tall before the jury than an expert who has engaged in painstaking inquiry and analysis before arriving at an opinion. *Id.* at 615–616.

Moreover, real harm to the truth finding process, as well as to public confidence in the integrity of our system of justice, can be done even when the influence a lawyer has on an expert's testimony is substantially more subtle and less flagrant than was the case in the "parroting" scenario that occurred in *Occulto*. If it occurs at a key analytical juncture, even a modest and subtle redirection of an expert's emphasis, focus, or line of reasoning could have a major impact on the ultimate conclusion or opinion she reaches. Such redirection could be effected through conversation, written suggestion, or even in the way counsel package and deliver information to the expert. We are aware that at least some lawyers take professional pride in their ability to indirectly "control" their experts, e.g., through the timing or sequencing of the data/information they give the experts. Thus, we need not posit gross and clumsy corruption of the process to feel substantial concern about preserving (or promoting) the reality of independence in thinking that is presented to a jury as independent.

This concern grows when we appreciate the nature of the subject matters about which much expert testimony is offered under current litigation practice. At least since the age of the enlightenment, many people in our society have tended to equate "science" with "objective truth." Many people have assumed that there is "out there" one "objective reality" and that "science" accurately discloses it. These concepts are applicable, at best, to a relatively small percentage of the subjects about which experts are called to testify in our courts today. Science is not a unitary process. The word "science" is attached to a wide range of matters, from quantum mechanics to sociology. Some people use the word science in connection with accident reconstruction, commercial marketing of consumer goods, and uses of force by police officers. Much of what passes as science is elusive, soft, mobile, and, ultimately, subjective. Much of it changes with the fashions of the times, with different "schools" of thought, with different regions, sponsors, etc. There are many subjects about which experts with apparently fungible qualifications can and do offer, with comparably intense conviction, mutually exclusive views.

The fact that so much expert testimony concerns matters that are essentially out of empirical control makes it all the more important for the trier of fact to know, accurately, the source of the testimony. When matters are debatable, the background, attributes of mind, character and personality, and the perspective (or intellectual biases) of each of the debaters can play crucial

roles in a jury's or judge's assessment of the different positions being taken. These considerations make it even more important that the trier of fact know what the real source of expert testimony is. For all these reasons, we cannot agree with the *Bogosian* majority that there would be only a "marginal value in the revelation on cross-examination that the expert's view may have originated with an attorney's opinion or theory...." *Bogosian* at 595.

Having concluded that the capacity to discover and to disclose at trial the ways communications from counsel may have influenced an expert's opinion could contribute significantly to the interests that paragraph (4) of Rule 26(b) is intended to promote, we return, from a different perspective, to our examination of the effects that we would expect to ensue if counsel knew in advance that their communications with their testifying experts would be discoverable (to the extent that those communications related to the subjects about which the expert would testify). Such a rule certainly would constrain, probably considerably, communication from counsel to testifying expert. Counsel presumably would become much more careful about what they communicate and about how they package the information they ask their experts to review. Lawyers would be less likely to editorialize and to teach (cynics use the word "coach"), and more likely to confine their communications to the kind of information (facts, evidence) that would be discoverable in any event.

These tendencies, we submit, would be salutary. They would improve the likelihood that an expert's opinions really were hers. They might even improve the likelihood that those opinions would conform to the views that most of the other experts in that field might hold, given the same information. At a minimum, there would be more conceptual cleanliness in the process by which experts reach their conclusions, a development that should contribute to the integrity of the fact finding process at trial. And because lawyers would remain free to do their brainstorming and strategizing with *non*-testifying experts in full privacy, the only legitimate interests that would be harmed by such a rule would be those discussed above that relate to case-preparation efficiencies. While we acknowledge those interests, we cannot conclude that they outweigh the important contributions to the fact finding process that we believe will be made by the rule we adopt here.

## IV. CONCLUSION

In sum, we are not persuaded that the rule we embrace, that communications from counsel to a testifying expert are discoverable to the extent that they relate to matters about which the expert will testify, poses a serious threat to the principal values that the work product doctrine was designed to protect. We are persuaded that this rule could significantly advance the interests that were intended to be promoted by paragraph (4) of Rule 26(b) of the Federal Rules of Civil Procedure and by Rules 702, 703, and 705 of the Federal Rules of Evidence. We hope that the rule we adopt here will enhance the reliability of the fact finding process and will promote public confidence in our adjudicatory system by decreasing the likelihood that lawyers will make improper use of expert witnesses, by enhancing the effectiveness of cross-examination, and by encouraging counsel to utilize experts in a way that is most helpful to the trier of fact.

For all the reasons set forth above, we hold that all communications from counsel to a testifying expert that relate to the subjects about which the expert will testify are discoverable.[12]

IT IS SO ORDERED.

---

**12.** We decline to adopt a system in which we would routinely review such communications *in camera* in order to determine whether they are discoverable. Such a system would impose an

intolerable burden on the courts, who, in any event, are in nowhere nearly as good a position as opposing counsel to detect lines of influence running from the communications to the expert's testimony.