**Robert C. MAGEE, Plaintiff,**

v.

**THE PAUL REVERE LIFE INSURANCE COMPANY, Defendant.**

**No. CV 95–4574(ADS).**

United States District Court, E.D. New York.

March 21, 1997.

---

Westermann & Tryon by Michael D. Tryon, Garden City, NY, for Plaintiff.

Windels, Marx, Davies & Ives by Thomas J. Mulligan, Aimee Rapaport, New York City, for Defendant.

### ORDER

ORENSTEIN, United States Magistrate Judge:

This matter comes before the Court on five motions made by the respective parties. First, Defendant The Paul Revere Life Insurance Company moves (1) to compel the production of Plaintiff's medical records maintained by both his treating psychologist and psychiatrist, and (2) to reopen the depositions of both the psychiatrist and psychologist for the purpose of propounding questions to which they refused to respond. Second, Plaintiff moves to compel the production of documents responsive to its Second Request for Production of Documents. Third, Plaintiff moves to compel the production of documents withheld by Defendant on the grounds of the attorney-client and work product privileges. Fourth, Plaintiff seeks to have this Court set a reasonable fee for the deposition of Richard L. Goldstein, M.D., who conducted a Rule 35 mental examination of Plaintiff. Finally, Defendant moves for leave to serve and file an amended answer.

The Court ruled from the bench on three of the motions at the February 18, 1997 status conference held in this matter, reserving decision on Defendant's motion for leave to amend the Answer, as well as Plaintiff's motion to compel the production of documents withheld under claims of attorney-client and work product privilege. The following Memorandum memorializes the Court's rulings, and further disposes of the motion to compel production of documents. Because the Defendant's motion for leave to amend the Answer results in a dispositive finding, however, it will be addressed under a separate Report and Recommendation issued by the Court. See Fed.R.Civ.P. 72(b).

## BACKGROUND

Plaintiff commenced this breach of contract action under the Court's diversity jurisdiction, 28 U.S.C. § 1332. Briefly, Plaintiff claims that Defendant breached a policy of disability insurance (the "Policy"), issued to him on November 7, 1988, by ceasing to make monthly payments allegedly due and owing him under the Policy. Plaintiff's First Amended Complaint also set forth causes of action for violation of New York General Business Law Section 349, intentional infliction of emotional distress and prima facie tort; these causes of action, however, were dismissed by District Judge Spatt on February 17, 1997. Plaintiff seeks, *inter alia*, compensatory and punitive damages, as well as declaratory relief. Defendant's chief defense to the action is that Plaintiff is not permanently mentally disabled within the meaning of the Policy.

## DISCUSSION

### I. Defendant's Motion to Compel Production of Psychiatric/Psychological Records and to Reopen Plaintiff's Experts' Depositions

Defendant moves, pursuant to Federal Rule of Civil Procedure 37(a)(2)(A) and (B), for an order (1) compelling the production of certain medical records from Eugenio Tassy, M.D., Plaintiff's psychiatrist, and Stephen Rashkin, Ph.D., Plaintiff's psychologist, and (2) requiring Dr. Tassy and Dr. Rashkin to resubmit to depositions to respond to questions regarding communications with Plaintiff that they were instructed not to answer at their original depositions.

## A. Production of Documents

On or about October 3, 1996, Defendant, in accordance with Federal Rule of Civil Procedure 45, served subpoenas upon Drs. Rashkin and Tassy, both of whom had been designated expert witnesses under Federal Rule 26(a)(2)(A) and Article II.B.1 of the Eastern District of New York's Civil Justice Expense and Delay Reduction Plan. The subpoena commanded them to appear for deposition at defense counsel's offices on October 28, 1996 at 10:00 a.m. and 1:30 p.m., respectively. The subpoenas also commanded Drs. Rashkin and Tassy to produce certain documents at the depositions, to wit: "[all] original records and documents concerning Robert Magee in [their] possession." (*See* Mulligan Aff. Ex. C.) Plaintiff had executed authorizations on March 18, 1996 for the release of his records from both doctors. (*See* Mulligan Aff. Ex. F.)

### 1. Dr. Rashkin

Dr. Rashkin was deposed on December 17, 1996. According to Defendant, when reminded to bring his records to the deposition, Dr. Rashkin "indicated that he did not want to produce his 'personal notes'" (Mulligan Aff. ¶ 11.) At his deposition, Dr. Rashkin testified that he took some twelve to fifteen pages of handwritten notes in connection with his sessions with Plaintiff. (Rashkin Dep. at 72, 178–79.) The handwritten notes reflected "personal feelings or observations" of the sessions. (*Id.* at 72.) He further testified that he stopped taking handwritten notes sometime in mid–1993, approximately two-and one-half years prior to the commencement of the instant action, because he

felt as though if I would have to produce any handwritten notes on Mr. Magee, I didn't want to have them in my possession so that I would have to do that. I felt it would be very detrimental to our relationship and his mental health in the future if that information ever had to be produced.

(Rashkin Dep. at 139–40.) In addition, the following colloquy took place at the deposition between Dr. Rashkin and Plaintiff's counsel:

Mr. Tryon: Now, when you took these notes, did you intend that they become part of Mr. Magee's medical record?

Dr. Rashkin: No, not at all.

Mr. Tryon: What was your intention in taking those notes?

Dr. Rashkin: They were personal notes for my use only.

Mr. Tryon: With respect to those notes, in your opinion, would they be understandable to someone who was reading them other than yourself?

. . .

Dr. Rashkin: No, they wouldn't be understandable to anyone. They're shorthand notes that have meaning to a very specific situation. They wouldn't—they would have no meaning to anyone else.

Mr. Tryon: Do you believe that your notes will be capable of being comprehended by someone other than yourself?

Dr. Rashkin: No.

Mr. Tryon: With respect to those notes, *do you sometimes take notes like that with respect to sessions for patients other than Mr. Magee?*

Dr. Rashkin: *Yes, I do.*

Mr. Tryon: In your practice of clinical psychology since, I guess, 1984, have you ever provided your personal notes to any person including your patients?

Dr. Rashkin: No.

Mr. Tryon: Why is that?

Dr. Rashkin: They're personal notes, they are meant only for me. They would be detrimental if anybody could understand any of the notes or any of the information that were [sic] made. If they would be made public to anybody else, they could very well be detrimental to the relationship that I have with the patient and I think it would be unethical to do so.

(Rashkin Dep. at 179–80 (emphasis added).)

Initially, the Court notes that New York law governs questions of privilege in the instant motion. Under Federal Rule of Evidence 501, the forum state's law of privileges is borrowed when the forum state's substantive law "supplies the rule of decision" in a

particular action, as is the case in this breach of contract action brought under the Court's diversity jurisdiction. *See In re American Tobacco Co.,* 880 F.2d 1520, 1527 (2d Cir. 1989); *United Coal Cos. v. Powell Constr. Co.,* 839 F.2d 958, 965 (3d Cir.1988); *Jones v. Commercial Union Ins. Co.,* 161 F.R.D. 243, 245 (W.D.N.Y.1995); *Nelson v. Greenspoon,* 103 F.R.D. 118, 122 (S.D.N.Y.1984). Here, Section 4507 of the New York Civil Practice Law and Rules applies to communications between Dr. Rashkin, a licensed psychologist, and Plaintiff. It provides in pertinent part as follows:

> The confidential relations and communications between a psychologist registered under the provisions of article one hundred fifty-three of the education law and his client are placed on the basis as those provided by law between attorney and client, and nothing in such article shall be construed to require any such privileged communications to be disclosed.

The thrust of Defendant's argument is that Plaintiff, by putting his mental condition affirmatively in controversy, and by utilizing the advice and testimony of Dr. Rashkin in support of his position that he is permanently disabled within the meaning of the applicable Policy, has thereby waived any protection afforded by New York's statutory psychologist-patient privilege. Plaintiff presents three arguments in opposition to Defendant's application. First, Plaintiff asserts that his written authorization does not thereby automatically entitle Defendant to *any* of his medical records, citing case law for the proposition that medical records are ultimately the property of the treating psychologist. Second, Plaintiff maintains that Dr. Rashkin's personal notes are not "medical records" under Section 17 of the New York Public Health Law. Finally, Plaintiff claims that, according to Dr. Rashkin's testimony, disclosure of the notes "will be extremely detrimental to [his] health and will cause a substantial interference with [his] treatment." (Pl.'s Mem. of Law in Opp'n to Def's Mot. to Compel at 10.)

■ It is beyond cavil that confidentiality is a vital component in the treatment of mental disease. The United States Supreme Court itself, in recently recognizing a federal psychotherapist-patient privilege, noted that "[b]ecause of the sensitive nature of the problems for which individuals consult psychotherapists, disclosure of confidential communications made during counseling sessions may cause embarrassment or disgrace. For this reason, the mere possibility of disclosure may impede development of the confidential relationship necessary for successful treatment." *Jaffee v. Redmond,* —— U.S. ——, ——, 116 S.Ct. 1923, 1928, 135 L.Ed.2d 337 (1996); *see Siesto v. Lenox Hill Hosp.,* 167 Misc.2d 918, 640 N.Y.S.2d 737, 739 (Sup.Ct. 1996). Nevertheless, in recognizing the privilege, the *Jaffee* Court iterated that fundamental axiom of privilege law, namely, that the patient may waive protection of the privilege, either expressly or impliedly. *Jaffee,* —— U.S. at —— n. 14, 116 S.Ct. at 1931 n. 14; *see von Bulow v. von Bulow,* 828 F.2d 94, 101 (2d Cir.1987).

Plaintiff's success in the instant action rests solely on establishing that he is indeed permanently mentally disabled within the meaning of the Policy issued by Defendant; in short, Plaintiff's mental condition is the overriding issue in this lawsuit. Moreover, he plans on putting Dr. Rashkin on the stand to testify as to such incapacity. Finally, Plaintiff himself executed an authorization permitting Defendant to obtain access to the medical records generated by Dr. Rashkin. Under these circumstances, Plaintiff clearly has waived any protection afforded his communications with Dr. Rashkin. *See People v. Wilkins,* 65 N.Y.2d 172, 490 N.Y.S.2d 759, 480 N.E.2d 373, 375 (1985)("It has ... long been the rule that when a patient puts in issue the condition for which he was examined by a physician he waives the privilege to the extent of permitting the physician to testify *as to the facts upon which his opinion is based* ...." (emphasis added)); *Levine v. Morris,* 157 A.D.2d 567, 550 N.Y.S.2d 289, 289 (1st Dep't 1990) (upholding order mandating disclosure of psychiatric records where plaintiff affirmatively placed psychological condition in issue); *Riccardi v. Tampax, Inc.,* 113 A.D.2d 880, 493 N.Y.S.2d 798, 799 (2d Dep't 1985)(" '[W]aiver [of the physician-patient privilege] occurs when the pa-

tient personally, or through his witnesses, either lay or medical, introduces testimony or documents concerning privileged information ....'" (quoting *Hughson v. St. Francis Hosp. of Port Jervis*, 93 A.D.2d 491, 463 N.Y.S.2d 224, 230 (2d Dep't 1983))); *Davis v. Ross*, 107 F.R.D. 326, 329 (S.D.N.Y.1985)(applying New York law)("when the mental ... condition of the plaintiff is in issue, the physician-patient privilege is waived and cannot be invoked to foreclose discovery of relevant evidence.").

■ Plaintiff does not dispute that his mental condition is in issue in this action, or that Dr. Rashkin will testify on his behalf at trial. Instead, he attempts to place Dr. Rashkin's personal notes outside the reach of discovery, due to their particularly sensitive nature. In *Cynthia B. v. New Rochelle Hosp. Med. Ctr.*, 60 N.Y.2d 452, 470 N.Y.S.2d 122, 458 N.E.2d 363, 368 (1983), the New York Court of Appeals observed that "[b]ecause of [the] potential of harm to a patient, medical records, particularly those of psychiatric treatment, should not be automatically and necessarily disclosed upon a patient's waiver of the privilege of confidentiality under CPLR 4504." The court further stated as follows:

> The treating doctor ... possessing such records should have the right to assert, by means of a motion for a protective order, reasons for preserving the confidentiality of all or portions of such records, notwithstanding a patient's waiver, in order to protect a patient, third party, or the doctor, ... from potential injury. Confronting the policy of preventing such harm, however, is the competing policy of liberal discovery, which must be considered by a court in deciding whether to exercise its discretion and issue an order compelling discovery under CPLR 3120.

*Id.* The court formulated a burden-shifting test to determine whether such a protective order was justified. First, if the records at issue are deemed material, and the Court further finds that the patient has waived the privilege by placing his mental condition in issue, "a strong presumption is created in favor of granting the motion to compel disclosure." *Id.* at 128, 458 N.E.2d at 369. The

burden then shifts to the treating physician to establish "that nondisclosure, in whole or in part, is reasonably necessary to prevent imminent and serious physical or psychological damage to the patient." *Id.* If the treating physician meets this burden, the Court proceeds to weigh the importance of the records against the claimed harm to Plaintiff that allegedly will be occasioned by disclosure. *Id.* Among the factors to be considered are "the imminence and seriousness of the claimed harm, the materiality of the information to the litigation, and the potential conflicts of interest which the custodian may have in objecting to disclosure." *Id.*

■ Here, the Court has found a waiver of the psychotherapist-patient privilege. Moreover, the records are material in that they were utilized by Dr. Rashkin in connection with his diagnosis and treatment of Plaintiff Consequently, Dr. Rashkin bears the burden of establishing that Plaintiff likely will suffer imminent and serious psychological injury if the personal notes are produced to Defendant. Dr. Rashkin has failed to sustain his burden. His vague and unsubstantiated assertion that disclosure of the notes would be "very detrimental to [his] relationship [with Plaintiff] and [Plaintiff's] mental health *in the future*," (Rashkin Dep. at 140 (emphasis added)), simply does not rise to the level of harm contemplated by the Court of Appeals in *Cynthia B.*

Even assuming, *arguendo*, that Dr. Rashkin met his burden of rebutting the strong presumption of discoverability accorded his notes, the scale would nevertheless tip decidedly in favor of ordering their disclosure. At his deposition, Dr. Rashkin testified that his notes reflected his "personal feelings" and "observations" of his sessions with Plaintiff Moreover, he also testified that he takes handwritten notes in connection with sessions of other patients. In defending this action, Defendant has the right to question Dr. Rashkin as to any information relied upon in evaluating the state of Plaintiff's mental health, including his personal notes. Precluding discovery of the notes would be tantamount to allowing Plaintiff to use the psychologist-patient privilege as both a sword and a shield, " 'to waive when it inures

to [his] advantage, and wield when it does not.'" *Farrow v. Allen*, 194 A.D.2d 40, 608 N.Y.S.2d 1, 4 (1st Dep't 1993)(quoting *McKinney v. Grand St., Prospect Park & Flatbush R.R.*, 104 N.Y. 352, 10 N.E. 544, 544 (1887)); *cf Martin v. New York City Transit Auth.*, 148 F.R.D. 56, 63–64 (E.D.N.Y.1993)(discussing sword/shield allegory in context of informant's privilege).

■ Moreover, Plaintiff's invocation of New York Public Health Section 17 does not aid his cause. Sections 17 and 18 of the New York Public Health Law exempt a physician's personal notes and observations from disclosure when a request for patient records is made. Sections 17 and 18 are rendered inoperable, however, once litigation has commenced. Specifically, Section 18(10) provides in relevant part that "[n]othing contained in this section shall restrict, expand or in any way limit the disclosure of any information pursuant to article[ ] ... forty-five of the civil practice law and rules." Therefore, a determination as to the discoverability of Dr. Rashkin's personal notes is governed solely by the Court's analysis under Section 4507 of the New York Civil Practice Law and Rules. *See Grogan v. Osborne*, No. 87 Civ. 7024 (KC), 1988 WL 49192, at *1 (S.D.N.Y. May 5, 1988)("Article 45 [of the N.Y. C.P.L.R.] ... controls despite section 18 of the Public Health Law.... "); *Boltja v. Southside Hosp.*, 153 Misc.2d 568, 582 N.Y.S.2d 635, 638 (Sup.Ct.)("There is not a scintilla of proof [that] the legislature intended sections 17 and 18 of the Public Health Law to serve other than the public interest in health care of our citizens. Certainly, the law was never designed nor intended to impinge upon the CPLR (see, Public Health Law § 18(10))."), *aff'd*, 186 A.D.2d 774, 589 N.Y.S.2d 341 (2d Dep't 1992). In any event, a federal court is not bound by the New York Public Health Law when a discovery dispute arises, *see Jones v. Commercial Union Ins. Co.*, 161 F.R.D. 240, 242 (W.D.N.Y.1994)(noting that while state law governs issues of privilege in diversity cases, federal law governs discovery procedure (citing *Dixon v. 80 Pine Street*

*Corp.*, 516 F.2d 1278, 1280 (2d Cir.1975))), although it may take state laws into account in the interest of federal-state comity. *See King v. Conde*, 121 F.R.D. 180, 192 (E.D.N.Y.1988).

Accordingly, Dr. Rashkin will be required to produce all handwritten notes generated by him in connection with his treatment of Plaintiff.[1] Such notes shall be subject to the terms of the Confidentiality Order entered by this Court on March 27, 1996.

## 2. Dr. Tassy

■ Dr. Tassy was deposed on November 27, 1996. As with Dr. Rashkin, Dr. Tassy refused to produce some ten to twelve pages of handwritten notes generated in connection with Plaintiff's visits. At Dr. Tassy's deposition, the following colloquy took place between Dr. Tassy and Defendant's counsel:

Mr. Mulligan: What is your custom and practice with respect to preparing the notes that you just referred to? How do you go about preparing those notes?

Dr. Tassy: Take the patient report and then also my impression and the dynamic of the session.

Mr. Mulligan: Do you take those notes down while you're speaking with the patient?

Dr. Tassy: Sometimes, or sometimes after the session.

Mr. Mulligan: If it's after the session, is it generally very close in time after the time of the session?

Dr. Tassy: Yes.

Mr. Mulligan: After you write those notes what do you do with them?

Dr. Tassy: I ke[ep] them in the patient file and prepare them for the next session, go over them.

(Tassy Dep. at 31–32.) The analysis employed by the Court with respect to Dr. Rashkin's personal notes is equally applicable

---

1. Plaintiff's argument that he has no absolute right to his medical records is an abstract one. Dr. Rashkin has in fact produced all of Plaintiff's records save his personal notes. Moreover, there is no indication that Dr. Rashkin will disregard

to Dr. Tassy.[2] Having placed his mental condition in issue and sought Dr. Tassy's testimony with respect to that condition, Plaintiff has waived any protection enjoyed under New York law between psychiatrists and their patients. As is the case with Dr. Rashkin, Defendant is entitled to question Dr. Tassy with respect to all information relied upon in diagnosing Plaintiff; the portion of Dr. Tassy's deposition highlighted above reveals that he has utilized his notes in treating and diagnosing Plaintiff.

▆▆▆ Dr. Tassy's notes also are discoverable on an alternative ground. His testimony demonstrates that he repeatedly consulted his notes at the deposition to refresh his recollection. (*See, e.g.,* Tassy Dep. at 30, 50, 66.) That being the case, the Court is informed by Rule 612 of the Federal Rules of Evidence, which provides in relevant part that

if a witness uses a writing to refresh memory for the purpose of testifying . . .

(1) while testifying,

an adverse party is entitled to have the writing produced at the hearing, to inspect it, to cross-examine the witness thereon, and to introduce those portions which relate to the testimony of the witness.

Rule 612 has been held applicable to deposition testimony pursuant to Federal Rule of Civil Procedure 30(c).[3] *See Sporck v. Peil,* 759 F.2d 312, 317 (3d Cir.1985); *Derderian v. Polaroid Corp.,* 121 F.R.D. 13, 15 (D.Mass. 1988); *Al–Rowaishan Establishment Uni-*

*versal Trading & Agencies, Ltd. v. Beatrice Foods Co.,* 92 F.R.D. 779, 780 n. 1 (S.D.N.Y. 1982). Moreover, being phrased in mandatory language, Rule 612(1) prevails when pitted against a claim of privilege. Accordingly, Dr. Tassy will be required to produce his handwritten notes.

**B. Reopening of Depositions**

▆▆▆ In addition to withholding their handwritten notes of sessions with Plaintiff, Drs. Rashkin and Tassy, on the instruction of Plaintiffs counsel, refused to answer questions relating to communications between themselves and Plaintiff at the sessions. (*See, e.g.,* Tassy Dep. at 33, 38, 45; Rashkin Dep. at 27, 33, 46.)

Other than iterating the importance of confidentiality in the treatment of mental illness, Plaintiff presents no authority for his proposition that, once a patient's psychologist or physician privilege has been waived, oral communications between a mental health care provider and the patient nevertheless remain protected. To the contrary, the Court takes notice that such communications represented an important component in the providers' diagnoses of Plaintiff. Consequently, Defendant may inquire into the communications.

**II. Plaintiff's Motion to Compel Production of Documents Withheld Under Claims of Attorney–Client and Work Product Privilege**

Plaintiff moves by letter application to compel the production of three documents

---

an Order of this Court compelling production of such notes.

2. The only substantive situational difference between Drs. Rashkin and Tassy is the actual privilege enjoyed by each. While communications between Dr. Rashkin and Plaintiff are governed by N.Y. C.P.L.R. Section 4507 (psychologists), those between Dr. Tassy and Plaintiff are governed by N.Y. C.P.L.R. Section 4504, which provides in pertinent part as follows:

(a) **Confidential information privileged.** Unless the patient waives the privilege, a person authorized to practice medicine . . . shall not be allowed to disclose any information which he acquired in attending a patient in a professional capacity, and which was necessary to enable him to act in that capacity.

In fact, the New York Court of Appeals has held that the protection afforded by Section 4507,

which is equated statutorily with the protection enjoyed between attorneys and their clients, is broader than that afforded under Section 4504. *See Wilkins,* 490 N.Y.S.2d at 763, 480 N.E.2d at 377.

3. Federal Rule of Evidence 612's applicability to disposition testimony is in accord with New York law. *See Stern v. Aetna Casualty & Surety Co.,* 159 A.D.2d 1013, 552 N.Y.S.2d 730, 730 (4th Dep't 1990); *Merrill Lynch Realty Commercial Servs., Inc. v. Rudin Management Co.,* 94 A.D.2d 617, 462 N.Y.S.2d 16, 17 (1st Dep't 1983)(finding privilege waived when writing becomes basis of pre-trial testimony); *Doxtator v. Swarthout,* 38 A.D.2d 782, 328 N.Y.S.2d 150, 152 (4th Dep't 1972)("We think it a sound rule that writings used prior to testifying for the purpose of refreshing the memory of a witness be made available to the adversary whether at the trial or at pre-trial examination.").

from Plaintiff's claim file that have been withheld by Defendant on the basis of the attorney-client and work product privileges. (Tryon Letter, dated January 14, 1997.) According to the privilege log served by Defendant upon Plaintiff in accordance with Eastern District Civil Rule 49.21(b)(1) and (2), two of the documents were authored by a Defendant Claim Department employee and addressed to one George Thompson, Esq., Defendant's in-house counsel. The documents consist of a request for instructions as to legal strategy, as well as Mr. Thompson's response to same. (*See* Mulligan Letter, dated January 22, 1997, Ex. A.) The third document is a telephone memorandum redaction relating to instructions from Mr. Thompson. (*See id.*)

Plaintiff's application is grounded upon the deposition testimony of Jerome Missel, M.D., a psychiatrist retained by Defendant to review Plaintiff's claim under the Policy and to offer his opinions as to Plaintiff's entitlement to proceeds under the Policy. At oral argument, defense counsel confirmed that Dr. Missel would testify at trial. At Dr. Missel's deposition, he testified that he had access to Plaintiff's claim file, and had reviewed it "from time to time." (Missel Dep. at 96.) Although Dr. Missel never testified to having reviewed the particular documents at issue (collectively the "Thompson documents" or "documents"), Plaintiff nevertheless maintains that his review of the claim file in general constitutes a waiver of the attorney-client privilege, as he is not an employee of Defendant.

Because Defendant seeks to shield the Thompson documents from discovery under alternate theories of attorney-client and work product privilege, the Court will address each in turn.

## A. Attorney–Client Privilege

■ Claims of attorney-client privilege in diversity actions are governed by state law. *See* Fed.R.Evid. 501; *supra* pp. 633–34 (and cases cited therein). In New York, the attorney-client privilege is codified at Section 4503(a) of the New York Civil Practice Law and Rules, which provides in pertinent part as follows:

**Confidential communication privileged; non-judicial proceedings.** Unless the client waives the privilege, an attorney or his employee, or any person who obtains without the knowledge of the client evidence of a confidential communication made between the attorney or his employee and the client in the course of professional employment, shall not disclose, or be allowed to disclose such communication, in any action . . . .

N.Y. C.P.L.R. § 4503(a) (McKinney 1992). "The privilege belongs to the client and attaches if information is disclosed in confidence to the attorney for the purpose of obtaining legal advice or services." *People v. Osorio,* 75 N.Y.2d 80, 550 N.Y.S.2d 612, 549 N.E.2d 1183, 1185 (1989). Moreover, as is the case with all privileges, the party invoking the attorney-client privilege bears the burden of establishing all essential elements of the privilege. *Id.; Priest v. Hennessy,* 51 N.Y.2d 62, 431 N.Y.S.2d 511, 409 N.E.2d 983, 986 (1980).

■ Plaintiff does not allege that Defendant has failed to establish the essential elements of attorney-client privilege with respect to the Thompson documents. His sole argument is that Dr. Missel's review of Plaintiff's claim file, which contained the documents, effectuated a waiver of the privilege. In so arguing, however, Plaintiffs focus on Dr. Missel's lack of a formal employment relationship with Defendant is misplaced. In determining whether Defendant waived the attorney-client privilege by permitting Dr. Missel's perusal of the Thompson documents, "[i]ntent must be the primary component." *Manufacturers and Traders Trust Co. v. Servotronics, Inc.,* 132 A.D.2d 392, 522 N.Y.S.2d 999, 1004 (4th Dep't 1987). As stated by the New York Court of Appeals in *Osorio,* "[t]he scope of the privilege is not defined by the third parties' employment or function . . .; it depends on whether the client had a reasonable expectation of confidentiality under the circumstances." 550 N.Y.S.2d at 615, 549 N.E.2d at 1186.

■ Here, Dr. Missel was retained by Defendant to review Plaintiff's condition and to offer his opinions as to Plaintiff's entitlement to benefits. This necessarily entailed

Dr. Missel's review of Plaintiff's claim file. His review of the claim file in his capacity as an independent consultant is not inconsistent with Defendant's reasonable expectation of confidentiality with respect to the Thompson documents; to the contrary, the review was conducted to assist Defendant's counsel in the litigation with Plaintiff. Moreover, there is no indication that the documents were viewed by any other third-party for purposes other than defending this action.

The cases cited by Plaintiff do not compel a different result. In *People v. Borcsok*, 107 A.D.2d 42, 485 N.Y.S.2d 766 (2d Dep't 1985), a criminal defendant maintained that a police detective's testimony as to a conversation between the defendant and a co-defendant inadvertently overheard in the courtroom violated his attorney-client privilege. The court, however, held that the privilege was not implicated because the communication was neither made to counsel nor made in furtherance of a common defense. *Id.* at 767. The court went on to note that "communications made in the presence of third parties, whose presence is known to the client, generally are not shielded from disclosure by application of the attorney-client privilege." *Id.* at 768. The *Borcsok* court's holding comports with this Court's analysis. Having been aware of the police detective's close proximity in the courtroom, the *Borcsok* defendant had no reasonable expectation that his communication with a co-defendant would be kept confidential, assuming that the communication was subject to the attorney-client privilege in the first instance. In sum, the *Borcsok* defendant spoke at his own peril.

As to *Eisic Trading Corp. v. Somerset Marine, Inc.*, 212 A.D.2d 451, 622 N.Y.S.2d 728 (1st Dep't 1995), another case cited by Plaintiff, the Court initially points out that little can be discerned from the opinion regarding the specific facts of the case. This Court agrees with the Appellate Division's holding that "[t]he attorney-client privilege applies only to confidential communications with counsel, not from information obtained from or communicated to third parties." *Id.*, 622 N.Y.S.2d at 728. The *Eisic Trading* court, however, did not conduct a "reasonable

expectation of confidentiality" test, as mandated by the Court of Appeals; alternatively, such may have been unnecessary given the implication in the court's memorandum that there was no attorney involvement whatsoever in the communications.

Accordingly, the Court upholds Defendant's claim of attorney-client privilege with respect to the Thompson documents.

### B. Work Product

■■■ The work product doctrine is codified under Rule 26(b)(3) of the Federal Rules of Civil Procedure, which provides in relevant part:

> **Trial Preparation: Materials.** Subject to the provisions of subdivision (b)(4) of this rule, a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering disclosure of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

The privilege aims "to establish a zone of privacy for strategic litigation planning and to prevent one party from piggybacking on the adversary's preparation." *United States v. Adlman*, 68 F.3d 1495, 1501 (2d Cir.1995). Rule 26(b)(3) sets forth a three-pronged test for determining whether material is protected from disclosure under the work product doctrine. " 'The materials must (1) be a document or tangible thing, (2) that was prepared in anticipation of litigation, and (3) was prepared by or for a party [to the action] or by or for his representative.' " *Vermont Gas Sys., Inc. v. United States Fidelity & Guar. Co.*, 151 F.R.D. 268, 275 (D.Vt.1993)(Parker,

C.J.)(quoting *In re Grand Jury Subpoenas Dated December 18, 1981 and January 4, 1982*, 561 F.Supp. 1247, 1257 (E.D.N.Y. 1982)); *accord P & B Marina v. Logrande*, 136 F.R.D. 50, 57 (E.D.N.Y.1991), *aff'd*, 983 F.2d 1047 (2d Cir.1992). The burden of establishing all three elements of the work product privilege rests with the party invoking the privilege. *United States v. Construction Prods. Research*, 73 F.3d 464, 473 (2d Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 294, 136 L.Ed.2d 213 (1996); *von Bulow v. von Bulow*, 811 F.2d 136, 144 (2d Cir.1987)(citing *In re Grand Jury Subpoena Dated January 4, 1984*, 750 F.2d 223, 224 (2d Cir.1984)). In seeking to discharge this burden, " 'mere conclusory or *ipse dixit* assertions' " will not suffice. *In re Grand Jury Subpoena*, 750 F.2d at 225 (quoting *In re Bonanno*, 344 F.2d 830, 833 (2d Cir.1965)).

■■■ Here, the first and third prongs of the tripartite test set forth in Rule 26(b)(3) clearly are met. The Thompson materials constitute documents. Moreover, they were prepared by a Defendant employee. The only remaining question, therefore, in determining whether the work product privilege is implicated is whether the documents were prepared "in anticipation of litigation." In determining whether documents were generated for litigation purposes, the Second Circuit Court of Appeals recently counseled that a party must demonstrate "that the documents were prepared principally or exclusively to assist in anticipated or ongoing litigation." *Construction Prods.*, 73 F.3d at 473. Conversely, "[i]f the materials are assembled in [the] ordinary course of business ... the documents are not shielded by the work product privilege." *Exxon Chem. Patents, Inc. v. Lubrizol Corp.*, 131 F.R.D. 668, 670 (S.D.Tex.1990); *accord Hardy v. New York News, Inc.*, 114 F.R.D. 633, 644 (S.D.N.Y.1987). The determination of whether a document qualifies for work product immunity requires a fact-sensitive inquiry by the Court. " '[T]he test should be whether, in light of the nature of the document[s] and the factual situation in the particular case, the document[s] can fairly be said to have been prepared or obtained because of the prospect of litigation.' " *In re Leslie Fay Co. Sec. Litig.*, 161 F.R.D. 274, 280

(S.D.N.Y.1995)(quoting 8 Charles A. Wright, Arthur R. Miller and Richard L. Marcus, Federal Practice and Procedure § 2024 (2d ed.1994)).

■■■ In insurance cases generally, determining whether documents constitute work product can be difficult because the potential for litigation always exists should an insurer deny a claim for benefits. Here, one of the Thompson documents, namely, the telephone memo redaction, was generated subsequent to the commencement of this litigation on or about November 7, 1995. Consequently, this document constitutes work product, as it relates to legal advice in connection with ongoing litigation.

■■■ The remaining two documents are dated November 11, 1994 and May 26, 1995, respectively. In its opposition papers, Defendant maintains that litigation was anticipated in or about May 1994. In support thereof, Defendant has supplied the Court with a field representative report dated May 5, 1994. (*See* Mulligan Letter, dated January 22, 1997, Ex. B.) The report was prepared by one Marc Lippel, and concerned telephone conversations he had with Plaintiff's attorney. The report reflects unsuccessful attempts to settle Plaintiff's claim amicably. The report concluded as follows:

*RECOMMENDATIONS*

We are far from reaching a fair and equitable claim compromise. I suggest we refer the file back to the Psych Unit to determine if we have sufficient medical information to deny Total Disability Benefits or if we need a Psychiatric IME. I would also suggest that we refer the case to George Thompson for his legal opinion. If we take the position to deny benefits, Mr. Tryon affirmed that he will litigate this matter and prevail with a jury decision.

(*Id.*) Based on the foregoing, and particularly Plaintiff's attorney's express threat of litigation should Defendant deny benefits, the Court holds that it was reasonable for Defendant to anticipate litigation in May 1994. Therefore, the work product privilege was triggered at that time. Accordingly, the two Thompson documents prepared prior to the

filing of this action are protected under the privilege.

▆▆▆ The Court also finds that Dr. Missel's alleged review of the Thompson documents did not effect a waiver of the privilege. Because the work product doctrine aims not only to preserve confidentiality, but also to protect the integrity of the adversary system, the privilege "is not automatically waived by any disclosure to a third party." *In re Sealed Case,* 676 F.2d 793, 809 (D.C.Cir.1982). Protection is waived only if such disclosure "substantially increases the opportunity for potential adversaries to obtain the information." *In re Grand Jury Subpoenas,* 561 F.Supp. at 1257; *accord S.N. Phelps & Co. v. The Circle K Corp.,* Nos. 96 Civ. 5801 and 96 Civ. 6479, 1997 WL 31197, at * 10 (S.D.N.Y. Jan. 28, 1997); *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.,* 160 F.R.D. 437, 448 (S.D.N.Y.1995). In the case at bar, release of the Thompson documents to Dr. Missel, who was acting as Defendant's consultant, did not increase the probability that the documents would fall into enemy hands. *See S.N. Phelps & Co.,* 1997 WL 31197, at * 10–11 (finding no waiver in release of work product to third-party where both had common interest in the litigation); *see also In re Pfizer, Inc. Sec. Litig.,* No. 90 Civ. 1260 (SS), 1993 WL 561125, at *6 (S.D.N.Y. Dec.23, 1993)("Disclosure of work product to a party sharing common interests is not inconsistent with the policy of privacy protection underlying the doctrine.").

Nevertheless, because Dr. Missel has been retained by Defendant to provide expert testimony at trial, his alleged review of the Thompson documents alternatively may constitute a waiver of the work product privilege under Rule 26, which reads in relevant part:

(a) **Required Disclosures; Methods to Discover Additional Matter.**

. . . .

(2) **Disclosure of Expert Testimony.**

(A) [A] party shall disclose to other parties the identity of any person who may be used at trial to present evidence under Rules 702, 703, or 705 of the Federal Rules of Evidence.

(B) Except as otherwise stipulated or directed by the court, this disclosure shall, *with respect to a witness who is retained or specially employed to provide expert testimony in the case . . .,* be accompanied by a written report prepared and signed by the witness. *The report shall contain* a complete statement of all opinions to be expressed and the basis and reasons therefor; *the data or other information considered by the witness informing the opinions . . . .*

(emphasis added). Whether expert consideration of attorney work product vitiates the work product privilege "highlights the tension . . . between a court's duty to prevent the disclosure of attorney opinion work product on the one hand, and . . . Rule[ ] [26's] mandate for expert disclosure, possibly including that same work product, on the other." *Karn v. Rand,* 168 F.R.D. 633, 635 (N.D.Ind.1996). The advisory committee notes to the 1993 Amendments to Rule 26(a) seem to suggest that the required expert disclosure under Rule 26(a)(2)(B) overrides a claim of privilege:

The [expert] report is to disclose the data and other information considered by the expert . . . . Given this obligation of disclosure, litigants should no longer be able to argue that materials furnished to their experts to be used in forming their opinions—whether or not ultimately relied upon by the expert—are privileged or otherwise protected from disclosure when such persons are testifying or being deposed.

Fed.R.Civ.P. 26 advisory committee's note to 1993 Amendments to subdivision (a), paragraph (2). Citing the text of new Rule 26(a)(2),[4] the advisory committee notes, and public policy grounds,[5] the *Karn* court held

---

4. The 1993 Amendments to the Federal Rules of Civil Procedure became effective on December 1, 1993.

5. According to the *Karn* court, policies favoring full disclosure of materials considered by an expert include the importance of full and fair cross-examination, including possible impeachment, of the expert, *see id.* at 640 ("Without pre-trial access to attorney-expert communications, opposing counsel may not be able to effectively

that Rule 26(a)(2)(B) "mandate[s] disclosure of *all* materials reviewed by an expert witness," and correspondingly "'trump[s]' any assertion of work product or privilege." *Id.* at 639 (emphasis added); *see also Intermedics, Inc. v. Ventritex, Inc.*, 139 F.R.D. 384, 387 (N.D.Cal.1991)("[A]bsent an extraordinary showing of unfairness that goes well beyond the interests generally protected by the work product doctrine, written and oral communications from a lawyer to an expert that are related to matters about which the expert will offer testimony are discoverable, even when those communications otherwise would be deemed opinion work product."); *Boring v. Keller*, 97 F.R.D. 404, 407 (D.Colo. 1983)("One situation in which opinion work product is not protected is where an expert witness utilizes counsel's opinion work product in order to formulate his or her opinion.").

Two other federal district court rulings subsequent to the 1993 Amendments to the Federal Rules on the interplay between opinion work product and expert disclosure, however, held that Rule 26(a)(2)(B) did not effect a waiver of legitimate claims of work product privilege under Rule 26(b)(3) by virtue of an expert's consideration of the privileged materials. Downplaying the significance of effective cross-examination and impeachment of expert witnesses when weighed against the "strong policy against disclosing an attorney's opinion work product," the court in *Haworth, Inc. v. Herman Miller, Inc.*, 162 F.R.D. 289 (W.D.Mich.1995) held that Rule 26(a) should not be read as defeating a claim of work product privilege. *Id.* at 295 ("For the high privilege accorded attorney opinion work product not to apply would require

clear and unambiguous language in a statute. No such language appears here." (citation omitted)); *accord All West Pet Supply Co. v. Hill's Pet Prods. Div.*, 152 F.R.D. 634, 638 (D.Kan.1993)(finding work product portions of documents protected despite being shared with expert witness); *see also Bogosian v. Gulf Oil Corp.*, 738 F.2d 587, 593–94 (3d Cir.1984)("Even if examination into the lawyer's role [in framing an expert's opinion] is permissible, ... the marginal value in the revelation on cross-examination that the expert's view may have originated with an attorney's opinion or theory does not warrant overriding the strong policy against disclosure of documents consisting of core attorney's work product."). The *Haworth* court further interpreted the advisory committee's notes to the 1993 amendments to Rule 26(a)(2) as clarifying only that *factual* material contained in privileged documents considered by an expert must be disclosed. *Haworth*, 162 F.R.D. at 295; *see All West Pet Supply Co.*, 152 F.R.D. at 639 n. 9.[6]

■ Having reviewed the relevant case law, the text of Rule 26(a) and (b) and the associated commentary provided by the advisory committee, the Court holds that "the data or other information considered by [an expert] witness in forming [his] opinions" required to be disclosed in the expert's report mandated under Rule 26(a)(2)(B) extends only to factual materials, and not to core attorney work product considered by an expert. In so holding, the Court agrees with the *Haworth* court's view that Rule 26(a) should not be construed as vitiating the attorney work product privilege, and the lauda-

---

reveal the influence that counsel has achieved over the expert's testimony."), as well as the belief that disclosure will not violate the core principles of the work product privilege. *See id.* ("[P]roviding work product to an expert witness ... generally does not result in counsel developing new legal theories or in enhancing the conducting of a factual investigation. Rather, the work product either informs the expert as to what counsel believes are relevant facts, or seeks to influence him to render a favorable opinion.").

**6.** Courts addressing the issue of expert reliance on attorney work product also have discussed the interplay of Rule 26(b)(3) (the codification of the work product privilege) and 26(b)(4) (covering

discovery of experts). Because Rule 26(b)(3) is prefaced by the clause "[s]ubject to the provisions of subdivision (b)(4)", the argument has been made that core work product must yield to Rule 26(b)(4). In interpreting Rule 26(b)(3), however, courts have held the "subject to" proviso applicable only to the first sentence of the Rule, pertaining to ordinary work product, which essentially can be *any* material prepared by or for a party in anticipation of litigation, and *not* to the second sentence, which admonishes courts to refrain from ordering disclosure of core work product. *See Bogosian*, 738 F.2d at 594; *Haworth*, 162 F.R.D. at 293–94. *But see Intermedics*, 139 F.R.D. at 388.

ble policies behind it, in the absence of clear and unambiguous authority under the Federal Rules of Civil Procedure. *See also Hickman v. Taylor*, 329 U.S. 495, 514, 67 S.Ct. 385, 395, 91 L.Ed. 451 (1947)("[U]ntil some rule or statute definitely prescribes otherwise, we are not justified in permitting discovery [of attorney work product] as a matter of unqualified right."). The Court notes that should an expert deny being influenced by the attorney who retained him or her for litigation, the burden will be on the expert to establish, to the satisfaction of the trier of fact, adequate and independent bases for his or her opinions. Moreover, the expert's opinion is always subject to the scrutiny of other experts. *Haworth*, 162 F.R.D. at 296. In sum, "[t]he risk of an attorney influencing an expert witness does not go unchecked in the adversarial system." *Id.* at 295. Finally, the party seeking discovery of attorney work product materials may in compelling circumstances overcome the privilege, the issue to which the Court now turns.

■ Rule 26(b)(3) permits discovery of work product materials where the party seeking such discovery "has substantial need of the materials in the preparation of the party's case" and is "unable without undue hardship to obtain the substantial equivalent of the materials by other means." The foregoing standard, however, applies only to "ordinary" work product materials. The second sentence of Rule 26(b)(3) provides that "[i]n ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." These latter materials are denominated "core" or "opinion" work product. Although the level of protection afforded core work product materials has not been defined precisely by either the Supreme Court or the Second Circuit Court of Appeals, it is clear that it is substantially higher than that provided by the "substantial need" and "undue hardship" test. *See Upjohn Co. v. United States*, 449 U.S. 383, 401–02, 101 S.Ct. 677, 688–89, 66 L.Ed.2d 584 (1981)(finding core work product entitled to "special protection" and requiring "far

stronger showing of necessity and unavailability by other means" than that employed for disclosure of ordinary work product); *In re John Doe Corp.*, 675 F.2d 482, 492 (2d Cir.1982)(proclaiming attorney's mental processes discoverable on "rare" occasions); *see also In re Murphy*, 560 F.2d 326, 336 (8th Cir.1977)("[O]pinion work product enjoys a nearly absolute immunity and can be discovered only in very rare and extraordinary circumstances.").

■ In the case at bar, the Thompson documents appear to constitute the legal opinions of Defendant's in-house counsel, as well as the mental processes of both in-house counsel and a Defendant employee acting on Defendant's behalf. Consequently, the documents are properly labeled core work product. As such, Plaintiff bears a heavy burden of establishing an entitlement to the documents. Here, Plaintiff falls far short of discharging his burden. Other than his general observation that "the [d]ocuments relate to a review by [Defendant's] handling of [Plaintiff's] claim, including the manner in which an independent medical examination was conducted and the denial of benefits", (Tryon Letter, dated January 30, 1997, at 3), Plaintiff's only proffered need is that the Thompson documents are "essential" to prove his claims of intentional infliction of emotional distress and prima facie tort. (*See id.*) As noted previously, however, both of these causes of action were dismissed by Order of District Judge Spatt on February 17, 1997.

Despite the foregoing, the Court is not entirely satisfied from perusing Defendant's privilege log that the Thompson documents *solely* reflect the mental processes and opinions of Defendant and its counsel. Therefore, Defendant is required to submit the Thompson documents to the Court for *in camera* review to guard against the possibility that factual material is shielded from disclosure "by the expedient of combining them or interlacing them with core work product." *Bogosian*, 738 F.2d at 595. While it is not the policy of this Court to review regularly documents withheld under a claim of privilege, the *Bogosian* court noted that "[d]ocuments claimed to contain legal theories fall

within that small class of documents requiring in camera examination if the adversary is not satisfied with the attorney's claim of total work product protection." *Id.* at 596.

## III. Plaintiff's Motion to Compel Production of Documents Responsive to its Second Request for Production of Documents

Plaintiff moves to compel the production of documents responsive to its Second Request for Production of Documents. Specifically, Plaintiff's document request relates to "[Defendant's] claims experience under [Plaintiffs] type of policy, its claim adjustment practices and its strategies to limit losses in its disability insurance portfolio." (Tryon Letter, dated January 15, 1997, at 2.) Plaintiff seeks to establish that "[Defendant's] refusal to pay disability benefits under the Policy is part of an overall pattern of terminating or limiting unprofitable disability insurance policies." (*Id.* at 3.)

At oral argument, the Court observed that many, if not all, of the requested documents were no longer relevant in light of Judge Spatt's dismissal of Plaintiff's claims for prima facie tort, intentional infliction of emotional distress and violation of New York General Business Law Section 349. Plaintiff insisted, however, that many of the documents were relevant to the remaining breach of contract claim in that they could show that Defendant stopped paying Plaintiff benefits under the Policy for reasons other than his mental health.

Accordingly, Plaintiff is granted leave to serve another document demand limited specifically to the remaining breach of contract cause of action.

## IV. Reasonable Fee for Dr. Goldstein

At a status conference on October 31, 1996, this Court granted Defendant's application to conduct a mental examination of Plaintiff, in accordance with Rule 35(a) of the Federal Rules of Civil Procedure. The examination was conducted by Robert L. Goldstein, M.D. in November 1996. Sometime in early January 1997, Defendant served Dr. Goldstein's report upon Plaintiff, pursuant to Federal Rules 26(a)(2)(B) and 35(b). On or about January 14, 1997, Plaintiff served a Rule 45 subpoena upon Dr. Goldstein, directing him to appear for deposition at Plaintiff's counsel's offices in Garden City, New York on February 4, 1997.

By letter dated January 15, 1997, Defendant's counsel ("Defendant") advised Plaintiff's counsel ("Plaintiff") that Dr. Goldstein "informed [her] that he [would] only appear for a deposition upon the receipt of a $2,000.00 deposition fee on the Friday before the deposition." (Tryon Letter, dated January 28, 1997, Ex. A.) The letter further insisted that the depositions take place at defense counsel's offices. (*Id.*) In response, Plaintiff, by letter dated January 16, 1997, maintained that nothing in the Federal Rules required Plaintiff to compensate Dr. Goldstein in advance of the deposition. (Tyron Letter, dated January 28, 1997, Ex. B.) Plaintiff further protested that $2,000.00 was an unreasonable fee "for a deposition that is likely to take less than two hours." (*Id.*) Finally, Plaintiff offered to take Dr. Goldstein's deposition at either defense counsel's office or Dr. Goldstein's office. (*Id.*)

Defendant responded to Plaintiff's concerns by letter dated January 21, 1997. In the January 21 letter, (*see* Tryon Letter, dated January 28, 1997, Ex. C), Defendant advised Plaintiff that Dr. Goldstein was willing to submit to a two-hour deposition at defense counsel's offices for a fee of $1,300.00. Attached to the January 21 letter was an itemized bill prepared in advance by Dr. Goldstein. Specifically, Dr. Goldstein sought $250.00 for an hour of preparation for the deposition, $350.00 for an hour of travel time to the deposition, and $700.00 for two hours spent at the deposition. Plaintiff' refusal to accede to these terms led to its January 28, 1997 filing of a letter application seeking to have the Court set Dr. Goldstein's fee.

As a threshold matter, the Court refuses to deny Plaintiff's application for lack of compliance with Eastern District Civil Rule 49.6(a), which provides in pertinent part that "[p]rior to seeking judicial resolution of a discovery ... dispute, the attorneys for the affected parties ... shall attempt to confer in

good faith in person or by telephone in an effort to resolve the dispute." Although Plaintiff apparently never responded to Defendant's January 21, 1997 letter, which in effect amounted to a counteroffer, the parties did express their concerns to each other through an initial round of correspondence. The usual case in which the Court would reject a letter application for lack of compliance with Rule 49.6(a) would be where the moving party made no attempt *at all* to discuss a dispute. More important, however, the Court finds that denying Plaintiff's application for failing to confer in good faith would be an exercise in futility, given the contentious nature of this litigation.[7]

■ Turning to the merits of the application, the Court begins with Rule 26(b)(4)(C), which provides in relevant part as follows:

> Unless manifest injustice would result, (i) the court shall require that the party seeking discovery [from an expert] pay the expert a reasonable fee for time spent in responding to discovery under this subdivision.

Compensating an expert for his time spent in deposition is mandatory under the rule "to avoid the unfairness of requiring one party to provide expensive discovery for another party's benefit without reimbursement." *United States v. City of Twin Falls*, 806 F.2d 862, 879 (9th Cir.1986).

■ As referenced above, Dr. Goldstein is seeking $350.00 per hour for time spent traveling to and undergoing his deposition. He also seeks $250.00 for spending an hour preparing for the deposition. In determining whether an expert fee request is "reasonable," federal district courts have considered (1) the witness's area of expertise; (2) the education and training that is required to provide the expert insight that is sought; (3)

the prevailing rates for other comparably respected available experts; (4) the nature, quality and complexity of the discovery responses provided; (5) the cost of living in the particular geographic area; (6) any other factor likely to be of assistance to the court in balancing the interests implicated by Rule 26, *see Mathis v. NYNEX,* 165 F.R.D. 23, 24 (E.D.N.Y.1996); *Goldwater v. Postmaster Gen'l of the United States,* 136 F.R.D. 337, 340 (D.Conn.1991); (7) the fee being charged by the expert to the party who retained him; and (8) fees traditionally charged by the expert on related matters. *See Mathis,* 165 F.R.D. at 25; *U.S. Energy Corp. v. NUKEM, Inc.,* 163 F.R.D. 344, 345–46 (D.Colo.1995); *Jochims v. Isuzu Motors, Ltd.,* 141 F.R.D. 493, 496 (S.D.Iowa 1992). None of the foregoing factors have talismanic qualities. Instead, they provide a guide for the Court to utilize in an effort to "calibrate the balance so that a [defendant] will not be unduly hampered in [its] efforts to attract competent experts, while at the same time, an inquiring [plaintiff] will not be unfairly burdened by excessive ransoms which produce windfalls for the [defendant's] experts." *Anthony v. Abbott Lab.,* 106 F.R.D. 461, 465 (D.R.I. 1985).

■ Applying the foregoing factors, the Court initially notes that Dr. Goldstein is a 1965 graduate of Chicago Medical School, and has been in the private practice of psychiatry since 1970. Since 1984, he has served as Clinical Professor of Psychology at Columbia University's College of Physicians and Surgeons. Dr. Goldstein also directs the school's "Legal Issues in the Practice of Psychiatry" program, having obtained his law degree from Columbia School of Law in 1984. From 1970–1984, he served as Clinical Assistant Professor of Psychiatry at New York University School of Medicine. Dr. Gold-

---

**7.** Notwithstanding the five current discovery and/or procedural motions pending before the Court, the most obvious evidence of such contentiousness is the lack of professional courtesy extended by the attorneys for both parties. For example, this Court, by Order dated January 24, 1997, rejected Defendant's application to compel certain psychiatric and psychological records after Plaintiff pointed out that inadequate notice was given due to Defendant's failure to exclude Martin Luther King's Birthday. Plaintiff also maintained that the application had been served one day past a Court-imposed deadline for service of such motions, even though it had been served with an identical application prior to the deadline, which was returned to Defendant by the Court for exceeding the three-page limit prescribed by Eastern District Rule 49.6(b)(ii). Defendant now seeks to return the favor, insisting that the Court reject Plaintiff's opposition to their motion for leave to amend their Answer on the ground that it was filed two days late.

stein's curriculum vitae also reveals that he has held positions in a number of hospitals, has served on numerous boards and associations, has published over seventy articles in medical and psychiatric journals and periodicals, and has given some twenty-nine presentations at professionals meetings.

Nevertheless, other factors lead the Court to conclude that Dr. Goldstein's request for a fee of $350.00 per hour is unreasonable. First, Dr. Goldstein charged Defendant $250.00 per hour for his psychiatric examination of Plaintiff and corresponding preparation of a report. While Defendant explains that Dr. Goldstein charges $250.00 per hour only for work performed at his office, it is defense counsel and Dr. Goldstein who prefer that the deposition be conducted at defense counsel's offices. Second, Defendant has not submitted fees charged by similar experts in the psychiatric field; on the other hand, Plaintiff maintains that his treating psychologist and expert psychiatrist charge $120.00 and $250.00 per hour, respectively. Plaintiff also states that the psychiatrist retained by Defendant to examine Plaintiff in 1994 charged $150.00 per hour, and that another psychiatrist retained by Defendant as a trial expert charges $100.00 per hour. Finally, the Court notes that a $350.00 hourly rate is significantly higher than expert psychiatric fees deemed reasonable by other courts. *See Mathis*, 165 F.R.D. at 26 (upholding $250.00 hourly rate); *Goldwater*, 136 F.R.D. at 340 (reducing requested hourly fee of $350.00 to $200.00); *see also Jochims*, 141 F.R.D. at 497 (reducing engineering expert's requested hourly rate of $500.00 to $250.00 where Plaintiff claimed he was "internationally known" and "the leading authority" in his field); *cf. McClain v. Owens–Corning Fiberglas Corp.*, No. 89 C 6226, 1996 WL 650524, at *4 (N.D.Ill. Nov. 7, 1996)(reducing physician's requested hourly fee of $400.00 to $250.00 even though his credentials went unchallenged); *Anthony*, 106 F.R.D. at 465 ("The rate of $250.00 per hour used by [an expert] witness [with "impeccable credentials"] in less luxuriant times is itself extremely munificent, and is, in this court's view, at the outermost periphery of the range of sustainable rewards."). Taking into account the fee charged Defendant by Dr.

Goldstein thus far, his psychiatric expertise, the rates of other mental health experts involved in this litigation, and expert rates sustained by other courts, the Court holds that Dr. Goldstein is entitled to an hourly fee of $250.00. In so holding, the Court emphasizes that Rule 26(b)(4)(C) requires that an expert receive a "reasonable" fee, and not necessarily one justified under current market conditions.

 Having determined a reasonable fee for Dr. Goldstein, two issues remain, namely, whether he is entitled to compensation for travel time and for time spent preparing for the deposition. The short answers are yes and yes. Travel time has been held compensable. *See Sean v. Okuma Machine Tool, Inc.*, CIV. A. Nos. 93–3512, 93–6653, 1996 WL 256587, at *2 (E.D.Pa. May 8, 1996); *David Tunick, Inc. v. Kornfeld*, 151 F.R.D. 534, 536 (S.D.N.Y.1993); *In re "Agent Orange" Prod. Liab. Litig.*, 105 F.R.D. 577, 582 (E.D.N.Y.1985). While Plaintiff points out that he offered to travel to Dr. Goldstein's office for the deposition, Defendant states that the parties agreed to take the depositions of Plaintiff's experts at Plaintiff's counsel's offices and vice versa. The parties can either honor this agreement or modify it. Of course, if the deposition is held at Dr. Goldstein's office, he is not entitled to compensation for travel time.

With respect to time spent by experts preparing for deposition, courts are divided as to whether such time is compensable. Most courts have held in the affirmative. *See, e.g., Bridges v. Eastman Kodak Co.*, No. 91 Civ. 7985 (RLC), 1996 WL 47304, at *15 (S.D.N.Y. Feb. 6, 1996), *aff'd*, 102 F.3d 56 (2d Cir.1996); *McNerney v. Archer Daniels Midland Co.*, 164 F.R.D. 584, 587 (W.D.N.Y. 1995); *McHale v. Westcott*, 893 F.Supp. 143, 151 (N.D.N.Y.1995); *Hose v. Chicago and North Western Transp. Co.*, 154 F.R.D. 222, 228 (S.D.Iowa 1994); *Lancaster v. Lord*, No. 90 Civ. 5843 (RLC), 1993 WL 97258, at *2 (S.D.N.Y. Mar. 31, 1993); *Hurst v. United States*, 123 F.R.D. 319, 321 (D.S.D.1988). Other courts have refused to award compensation for preparation time, at least in the absence of compelling circumstances, such as where the litigation is particularly complex and/or the expert must review voluminous

records. *e.g., S.A. Healy Co. v. Milwaukee Metro. Sewerage Dist.,* 154 F.R.D. 212, 214 (E.D.Wis.1994); *Rhee v. Witco Chem. Corp.,* 126 F.R.D. 45, 47–48 (N.D.Ill.1989).

The Court holds that Rule 26(b)(4)(C) encompasses a reasonable fee for time spent by an expert preparing for deposition, but not for the time the expert spent preparing the attorney who retained him. Specifically, the Court is persuaded by the rationale of the *Hose* court that permitting compensation for preparation time actually facilitates the deposition process by avoiding repeated interruptions to enable the witness to refresh his recollection by consulting relevant medical records, or, as in this case, the witness's expert report. *See Hose,* 154 F.R.D. at 228. Moreover, the Court also finds that Dr. Goldstein's request for an hour of preparation time is eminently reasonable, and does not appear to seek compensation for time spent preparing Defendant's counsel.

Accordingly, Dr. Goldstein will be compensated at the rate of $250.00 per hour for one hour spent preparing for the deposition, one hour spent for travel to and from the deposition, if appropriate, and two hours spent at the deposition.[8] Plaintiff will tender payment to Dr. Goldstein accordingly.

## CONCLUSION

In accordance with the foregoing, the Court hereby enters the following Orders in this action:

(1) Defendant's motion to compel the production of the handwritten notes of Plaintiff's treating psychologist and treating psychiatrist is **GRANTED.** If such notes have not yet been turned over to Defendant, Plaintiff is directed to do so within seven (7) days of the date of this Order.

(2) Defendant's motion to reopen the depositions of Plaintiff's treating psychologist and treating psychiatrist is **GRANTED.** If said depositions have not yet taken place, they shall be conducted within ten (10) days of

Defendant's receipt of the handwritten medical notes.

(3) Plaintiff's motion to compel production of the Thompson documents is **DENIED.** Defendant, however, shall file the documents with the Court for *in camera* inspection within seven (7) days of the date of this Order.

(4) Plaintiff's motion to compel the production of documents responsive to its Second Request for Production of Documents is **DENIED** without prejudice. If he has not yet done so, Plaintiff shall re-serve his demand to request documents relating solely to his remaining claim for breach of contract within ten (10) days of the date of this Order.

(5) Plaintiff's application to have this Court set a reasonable fee for Dr. Richard Goldstein is **GRANTED.** Dr. Goldstein shall be compensated at the rate of $250.00 per hour for the activities outlined above.

**IT IS SO ORDERED.**

---

8. The parties advised the Court that, subsequent to Plaintiff's letter application, Dr. Goldstein was in fact deposed. While the Court assumes the deposition lasted two hours, Dr. Goldstein's total fee should be adjusted by the parties for any variation in length.